601 F.2d 773
 UNITED STATES of America, Plaintiff-Appellee,
v.
David HARBIN, Lonnie Mims, Nolan O'Quinn, William Stanley,
Johnny Thompson, a/k/a J. T., Descel Eldridge,
Chuck Pruitt and Roger Cleckler,
Defendants- Appellants.
 No. 77-5835.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 27, 1979.
 
 C. Wes Pittman, Panama City, Fla., Court-Appointed, for Harbin.
 William F. Wager, Jr., Panama City, Fla., Court-Appointed, for Stanley.
 Henry R. Barksdale, Pensacola, Fla., Court-Appointed, for Cleckler.
 Michael B. Mann, Lynn Haven, Fla., for Eldridge Thompson.
 Michael M. Corin, Asst. Fed. Public Defender, Tallahassee, Fla., for defendants-appellants.
 Nickolas P. Geeker, U. S. Atty., Pensacola, Fla., Donald Modesitt, Asst. U. S. Atty., Tallahassee, Fla., for plaintiff-appellee.
 Appeals from the United States District Court for the Northern District of Florida.
 Before GEWIN, GEE and RUBIN, Circuit Judges.
 GEE, Circuit Judge:
 
 
 1
 Appellants David Harbin, Lonnie Mims, Nolan O'Quinn, William Stanely, Johnny Thompson, Descel Eldridge, Chuck Pruitt, and Roger Cleckler appeal from their convictions of conspiracy to possess marijuana and/or cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Appellants, and other alleged coconspirators who have already been convicted,[1] were apprehended as a result of a lengthy investigation conducted by the Florida Department of Criminal Law Enforcement (FDCLE), with the assistance of federal Drug Enforcement Administration (DEA) agents in Texas, of drug traffic in the Panama City, Florida, area. In February 1977, an FDCLE agent obtained authorization for a wiretap from a Florida Supreme Court justice that produced evidence of conversations among the appellants regarding past and planned future trips to Texas and Mexico to obtain drugs for distribution in the Florida market. This information was shared with DEA agents in Texas and guided surveillance in both Florida and Texas until DEA agents were able to arrest five persons during the course of a drug transaction in Texas on March 15, 1977. Arrests of other alleged members of the conspiracy followed shortly thereafter.
 
 
 2
 Appellants attack the validity of their convictions by asserting that the wiretape was illegal; that the prosecutor impermissibly commented on their failure to testify; that the trial court erred in denying their motions for a bill of particulars, for a continuance, and for the exclusion of evidence promised but in noncompliance with the court's order not furnished to defendants before the trial began; that certain prejudicial telephone calls and one defendant's post-arrest admissions were improperly admitted; and that there was insufficient evidence to convict some of the defendants of conspiracy. With the exception of O'Quinn's convictions for conspiracy to possess with intent to distribute both marijuana and cocaine and Cleckler's conviction on the cocaine count, for which we find insufficient evidence, we find no reversible error in the proceedings below and affirm.
 
 
 3
 Appellants' attack on the legality of the wiretap runs headon into our ruling sustaining it in the earlier prosecution, United States v. Hyde, 574 F.2d 856 (5th Cir. 1978), and no new allegations are presented in the instant appeal. Therefore, stare decisis leads us to reject these complaints.
 
 
 4
 Appellants' attack on statements made by government counsel as comments on their failure to testify in violation of their fifth amendment rights, See Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), requires more discussion. The United States entered extensive wiretapped conversations as evidence at trial, which necessitated calling witnesses to identify the various voices heard on the recordings as those of particular defendants. During his closing argument the United States Attorney stated to the jury:
 
 
 5
 Now, you personally, of course, don't have knowledge of the voices of various people in the case, but the people who testified said that they knew these people. They explained to you how they knew them and the circumstances of their voice identification.
 
 
 6
 He also declared, in another comment on prosecution witnesses:
 
 
 7
 And it was clear it was clear as it could be that these people were telling the truth and that they were not holding back anything or getting anybody. Did you hear the defense attorney spring out anything, weren't you trying to get this guy because you hate him? No, there is no undercurrent to that in this trial at all. These people were merely getting up here, if you want to use the term, "spilling the whole beans" on everybody. Just laid it right out.[2]
 
 
 8
 Appellants characterize these two statements as improper comments on their failure to take the stand by reasoning that the jurors could only have personal knowledge of their voices by having heard them testify, and the government witnesses' testimony could only have been contradicted by that of defendants so that the comments served to point out their failure to take the stand. While oblique comments on a defendant's failure to testify, if sufficiently suggestive, can be as pernicious and as unlawful as direct comments, United States v. Brown, 546 F.2d 166, 173 (5th Cir. 1977); United States v. Driscoll, 454 F.2d 792, 800 (5th Cir. 1972); Carlin v. United States, 351 F.2d 618 (5th Cir. 1965), we find no such reversible error here.
 
 
 9
 The test to be applied when it is claimed that a prosecutor has impermissibly commented on a defendant's fifth amendment protected silence is whether or not " 'it can be said that the prosecutor's manifest intention was to comment upon the accused's failure to testify (or) was . . . of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " United States v. Ward, 552 F.2d 1080, 1083 (5th Cir. 1977), Cert. denied, 434 U.S. 850, 98 S.Ct. 161, 54 L.Ed.2d 119 (1978) (quoting Samuels v. United States, 398 F.2d 964, 968 (5th Cir. 1968), Cert. denied, 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566 (1969). We conclude that appellants have failed to satisfy either of these criteria. Rather than manifestly being intended to call the defendants' silence to the attention of the jury, we believe that the prosecutor's first statement was no more than a reminder to the jury that the defendants' voices had been reliably identified by witnesses. And while the first statement could have been interpreted as an indirect reference to the fact that the jury had never personally heard the defendants' voices from the stand, its character was not such that the jury would "naturally and necessarily" understand it as directed at the defendants' silence.
 
 
 10
 The second statement assailed by defendants was even more innocuous. In context, it clearly did not address the defendants' failure to take the stand by parading as uncontradicted government testimony that could have been disputed only by defendants. Cf. Davis v. United States, 357 F.2d 438, 441 (5th Cir. 1966) (finding an oblique comment was directed at defendant's failure to testify because it pointed to the uncontradicted nature of testimony that only defendant could dispute). Instead, it was directed to defense attorneys' inability to cast doubt on the testimony of government witnesses by demonstrating that they were improperly motivated by animosity toward the defendants or had told a tale slanted by incomplete disclosures of relevant information. Moreover, any damage conceivably inflicted by either statement was cured by the trial judge's instruction to the jury that the defendants were under no obligation to testify. See United States v. Brown, 546 F.2d 166, 173-74 (5th Cir. 1977); United States v. Jennings, 527 F.2d 862, 871 (5th Cir. 1976).
 
 
 11
 Appellants next contend that the trial court erred in denying their motions for a bill of particulars, for the exclusion of evidence requested in the motion for the bill of particulars and not provided them, and for a continuance after the government finally provided massive discovery on the second day of trial. After they were indicted for a conspiracy extending over two-and-one-half years (shortened to one-and-one-half years by a superseding indictment), defendants moved for a bill of particulars specifying the date and the location where each defendant allegedly conspired with each of the other members of the conspiracy and identifying all overt acts taken in furtherance of the conspiracy. At a pretrial motion hearing on September 12, 1977, approximately two months before the date set for trial, the United States Attorney announced that he would voluntarily provide that information within ten days. The trial court deferred for the ten-day period further consideration of the motion for a bill of particulars and directed the United States Attorney to make the requested information available to defendants at a reasonable time and place. Seventeen days later, defendants notified the court that the promised information had not been furnished, and with the court's approval the prosecutor renewed his pledge to provide the information. The defendants did not inform the trial judge of the prosecutor's continuing failure to provide the information sought in the bill of particulars until the day the jury was to be selected. At that time, defendants moved for the exclusion of all evidence of transactions not revealed in the taped conversations that had been supplied defendants or, in the alternative, for the court to order the prosecutor to provide the promised information and to grant a continuance to afford defendants time to prepare to meet it. The court denied the defense motion on grounds that federal criminal discovery is restricted and that a bill of particulars is granted at the trial court's discretion. However, the judge did order the prosecutor to furnish the requested information and allowed defendants a one-day recess to analyze it. In response to the court's ruling, the government opened its files to defendants, giving them a complete list of witnesses and their written statements, as well as police reports and telephone records. Defendants repeated their motion for a continuance to allow them to assimilate this great quantity of information, but again it was denied.
 
 
 12
 The granting of a bill of particulars, the purpose of which is to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare his defense, to avoid or minimize the danger of surprise at trial, and to facilitate a plea of double jeopardy in the event of subsequent prosecution for the same offense, United States v. Mackey, 551 F.2d 967, 970 (5th Cir. 1977); United States v. Martinez, 466 F.2d 679 (5th Cir. 1972), Cert. denied, 414 U.S. 1065, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973), is a matter for the trial court's discretion. Denial of such a bill cannot be reversed on appeal unless there was a clear abuse of that discretion or unless the defendant was actually prejudiced by surprise at trial. Wong Tai v. United States, 273 U.S. 77, 82, 47 S.Ct. 300, 71 L.Ed. 545 (1927); United States v. Mackey, supra at 970. The determination to impose such sanctions as excluding evidence for violation of its own orders "is even more surely within the discretion of the ordinary court." United States v. Mackey, supra. And the disposition of a motion for a continuance is similarly committed to the trial judge's discretion and will not be reversed absent clear abuse. United States v. Moriarty, 497 F.2d 486, 489 (5th Cir. 1974). Consulting these standards, we find no error in the trial court's denial of the motions for a bill of particulars, for exclusion of evidence, and for a continuance.
 
 
 13
 The trial court's repeated directions to government counsel to make good their promise to provide the information sought in the bill of particulars and its arrangement for defendants to meet with the United States Attorney during a day-long recess in order to obtain the information precludes any finding that by failing to grant the motion for a bill of particulars the trial court abused its discretion and denied defendants "those materials necessary to advise them of the nature and cause of the accusation against them . . . ." United States v. Perez, 489 F.2d 51, 70 (5th Cir. 1973), Cert. denied,417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). The court's decision not to deprive the jury of the benefit of all testimony not contained in the taped conversations as a sanction for the government's failure to comply with the court's orders likewise cannot be ruled an abuse of its discretion. Defendants have not suggested on appeal that they suffered any specific prejudice from the government's failure to disclose the information it had promised, United States v. Mackey, supra at 970, and defendants themselves were remiss in not calling to the court's attention their difficulty in obtaining information from the prosecution before the trial started.
 
 
 14
 While we appreciate the burden of assimilating the quantity of material retrieved from the government's files that the denial of a continuance placed on defendants, the trial court acted within the scope of its discretion in providing instead a one-day recess for defendants' attorneys to analyze the additional information. This is especially so since the trial was expected to last ten days, giving the defense further time to prepare during the course of proceedings. Moreover, the defense was not ignorant of the prosecution's theory of the alleged crime and of some of the evidence the government intended to offer. At the September 12 pretrial motion hearing, the United States Attorney had disclosed to defendants that the government intended to rely primarily on the same evidence and theory that it had offered at the separate trial of appellants' alleged coconspirators. And defendants do not allege any specific prejudice that resulted from the denial of the continuance, such as an inability to call additional witnesses or to obtain impeaching statements that they otherwise could have presented.
 
 
 15
 Defendants Eldridge and Thompson argue that coconspirators' hearsay statements implicating them in the conspiracy were improperly admitted. The rule of United States v. Oliva, 497 F.2d 130, 132 (5th Cir. 1974), Modified, United States v. James, 590 F.2d 575 (5th Cir. 1979) (en banc), was in effect at the time of trial and governs this case. Under Oliva a coconspirator's hearsay declaration, made during the course of and in furtherance of the conspiracy, is admissible against an accused only if the government has established by independent evidence "a prima facie case of the existence of a conspiracy and of the defendant's participation therein . . . ." Id.
 
 
 16
 In the present case, the government supplied the necessary predicate for admitting the taped conversations among Hyde, Pruitt and Harbin, whose admission Thompson challenges. The government's independent evidence against Thompson included the testimony of Anita Clancy that she was a marijuana and cocaine dealer for Louis Hyde[3] and that on one occasion she had met Thompson, Hyde, and another coconspirator in McAllen, Texas, where they told her that they were there to buy marijuana and cocaine. Clancy also testified that another time she had gone to Austin, Texas, with Thompson and Hyde on a marijuana deal and that on a third occasion she was present in Texas when Hyde and Thompson delivered a sizeable amount of cash to another man. Two taped phone conversations between Thompson and Hyde, with persuasive voice identification, were also entered. In the first conversation, Thompson called Hyde, who discussed his planned trip to obtain drugs and told Thompson he would contact him to discuss prices. In the second conversation, Thompson again called Hyde and told him to complain to "Pete" (the supplier) about the quality of the last consignment of marijuana. Viewing this independent evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), Oliva, supra at 133-34, reasonable minds could easily conclude that it was inconsistent with the accused's innocence of conspiracy.
 
 
 17
 The government also adequately established Eldridge's knowing participation in the conspiracy by evidence independent of a taped phone conversation, challenged by Eldridge, between coconspirators Hyde and O'Quinn that characterized Eldridge as a dealer. Government witness Tondola Evans testified that she had been a marijuana dealer in Texas from March through August of 1976 and had worked for Eldridge in Texas by driving cars through border checkpoints for $500 per trip. Evans said that after passing the checkpoint and arriving in McAllen, Texas, she would leave the keys in the car, check into a motel room, and wait for Eldridge to come to the motel and contact her. This evidence of Eldridge's participation in the marijuana conspiracy was circumstantial because Evans testified that, while she assumed that the car she drove for Eldridge contained hidden marijuana, she never saw the drugs, and Eldridge never told her that the car contained marijuana. However, Evans also said that she twice drove cars from Texas to Panama City, Florida, for Hyde, that he paid her $500 for the first trip, and that Hyde told her that the car she drove for him contained marijuana. On the basis of her experiences with Hydge and Eldridge, Evans concluded that she performed the same task for each. Evans also testified that she occasionally saw Eldridge in Panama City and that she had overheard Eldridge's side of a phone conversation with Hyde discussing generally the quantity, availability and price of marijuana.
 
 
 18
 Government witness Anita Clancy testified that Eldridge was present when she obtained marijuana from Hyde for distribution and that shortly afterwards Hyde told her that he and Eldridge no longer were engaged in drug transactions together. Eldridge did not object to this statement as itself inadmissible hearsay unsupported by independent evidence that he was involved in the conspiracy, and we will not lightly disregard the rule requiring objection to the admission of evidence at trial. The admission of Clancy's testimony to Hyde's declaration was not "plain error," to be noticed absent an objection. Consequently, the jury could properly consider Hyde's reported statement indicating that Eldridge had participated in the drug conspiracy. This evidence and the circumstantial evidence presented by Evans provided the necessary prima facie case that Eldridge had been a member of the conspiracy. Therefore, the Hyde-O'Quinn tape was admissible against Eldridge.
 
 
 19
 We also reject Chuck Pruitt's challenge to his conviction based on the admission of certain telephone tapes that he asserts were prejudicial. In one tape, Hyde accused Pruitt of having pulled a gun on him three separate times. In the other recorded conversation, Pruitt asked Hyde how the latter's trial for battery was going. Hyde replied, "(Y)ou can't never tell about six goddam square jobs up there on that damn jury . . .." Pruitt delivered a vulgar expletive when he heard Hyde was being tried by a jury, and Hyde responded that "I ain't about to go in front of no damn judge." These remarks were irrelevant, but they were not directed to the guilt or innocence of Pruitt, and we believe that they were not of such an inflammatory character as to have affected the verdict as to the defendant's guilt. Their admission was therefore harmless error.
 
 
 20
 Defendant Cleckler argues that the trial court erred in admitting his confession about marijuana dealing before the government established corroborative proof of the existence of the marijuana conspiracy. It is true that to sustain a conviction on an extra-judicial confession, independent evidence or corroborative admissions must have established the offense before the case was submitted to the jury. Smith v. United States, 348 U.S. 147, 156, 75 S.Ct. 194, 99 L.Ed. 192 (1956). However, prior to this circuit's en banc decision in United States v. James, 590 F.2d 575 (5th Cir. 1979)(en banc), the order of proof regarding extra-judicial confessions and the independent or corroborative evidence of the crime was entirely at the judge's discretion. See, e. g., United States v. Baldarrama, 566 F.2d 560 (5th Cir. 1978), Cert. denied, 437 U.S. 906, 98 S.Ct. 3094, 57 L.Ed.2d 1136 (1979). While James articulates a "preferred order of proof" by which trial judges are to "require the showing of a conspiracy and of the connection of the defendant with it before admitting declarations of a coconspirator" whenever "reasonably practicable," 590 F.2d at 582, this rule was adopted only prospectively. Id. at 583. Cleckler's assertion of error in the order of presentation regarding his confession is thus without merit.
 
 
 21
 Lastly, appellants Thompson, Eldridge, Harbin, Stanley, Mims, O'Quinn, and Cleckler challenge the sufficiency of the evidence to convict them of conspiracy to possess marijuana with intent to distribute. Appellants O'Quinn and Cleckler also challenge the sufficiency of the evidence to support their convictions on the additional count of conspiracy to possess cocaine with intent to distribute.
 
 
 22
 For an accused to be convicted of unlawful conspiracy, there must be proof beyond a reasonable doubt that a conspiracy existed, that he knew of it, and that, with this knowledge, he voluntarily became a part of it. United States v. Malatesta, 590 F.2d 1379, 1381 (5th Cir. 1979) (en banc); United States v. Caro, 569 F.2d 411, 416 (5th Cir. 1978); United States v. Gutierrez, 559 F.2d 1278, 1280 (5th Cir. 1977). Intentional participation in a criminal conspiracy, however, "need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances.' " United States v. Malatesta, supra at 1381 (quoting Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942)). See United States v. Becker, 569 F.2d 951, 961 (5th Cir. 1978), Cert. denied, 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978); United States v. Barrera, 547 F.2d 1250, 1255-56 (5th Cir. 1977). Moreover, to be guilty of a single conspiracy, the "conspirators need not know each other or be privy to the details of each enterprise comprising the conspiracy . . . as long as the evidence is sufficient to show that each defendant possessed full knowledge of the conspiracy's general purpose and scope." United States v. Becker, supra at 961 (citations omitted); See United States v. Baldarrama,supra at 566; United States v. Perez, supra at 59-62.
 
 
 23
 Viewing the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and accepting all reasonable inferences and credibility choices that support the jury verdict, United States v. Becker, supra at 959, we find substantial[4] direct and indirect evidence that sustains the jury's conclusion that appellants Thompson, Eldridge, Harbin, Stanley, Mims and Cleckler entered into a conspiracy to distribute marijuana. However, our careful review of the record convinces us that the jury could not reasonably find that O'Quinn was, beyond a reasonable doubt, guilty of the marijuana conspiracy. Similarly, we fail to find sufficient evidence, excluding "every reasonable hypothesis but that of guilt," United States v. Caro, supra at 416, that either O'Quinn or Cleckler conspired to distribute cocaine.
 
 
 24
 The taped conversations, the testimony of coconspirators, and the evidence adduced by surveillance operations introduced at trial provided substantial evidence for the jury to find that a conspiracy to distribute marijuana existed and that at least one overt act was taken in furtherance of it. The evidence that appellants Thompson and Eldridge knew of the marijuana conspiracy and intentionally participated in it is outlined in our discussion of their challenge to the admission of the taped conversations of coconspirators, Supra (pp. 779-780). The jury could reasonably have found that Thompson, by several times purchasing marijuana with named conspirators in Texas for distribution in Florida, knowingly and voluntarily participated in the conspiracy and was aware of its general scope and purpose. And it could reasonably have inferred that Eldridge also voluntarily participated in the conspiracy with knowledge of the essential nature and scope of the plan from evidence that he purchased marijuana in Mexico, transported it into Texas, and transferred it to Hyde for further distribution in Florida.
 
 
 25
 Defendant Harbin bases his insufficient evidence claim on the contention that there was no evidence of a knowing agreement to conspire between him and any of the other alleged conspirators. However, the "government need not show that the conspirators articulated an express agreement . . .." United States v. Becker, supra at 959. The record contains a series of taped phone calls made by Harbin to Hyde in which they arranged to sell what the jury could reasonably have inferred was marijuana to a large-scale purchaser. In another call, Harbin asked Hyde to discover who had been selling what the jury could reasonably have believed was marijuana because he was trying to determine who had stolen some from him and mentioned a named conspirator as a likely culprit. The jury could also reasonably have found that Harbin indicated that he was aware that Hyde, with whom he personally dealt, was involved with a network of other drug distributors. The conversations between Hyde and Harbin provide substantial evidence that Harbin knowingly joined with a core conspirator to distribute marijuana and that even if he did not know all the details of the operation and all of its other members, he was aware of the conspiracy's general purpose of distributing drugs and of its approximate scope. Under our prior decisions, See, e. g., United States v. Perez, supra at 59-62, this is sufficient to convict Harbin of membership in the overall conspiracy.
 
 
 26
 The record also strongly refutes appellant Stanley's argument that the evidence against him did not establish a conspiratorial agreement between himself and Hyde or any other coconspirator or prove that he took an overt act in furtherance of the conspiracy and that he thus was impermissibly convicted on the basis of mere association, without knowledge that a conspiracy existed and without his intentional participation therein. Initially, we note that any challenge to a conspiracy conviction under 21 U.S.C. § 846, predicated on the notion that a finding of guilt requires proof of an overt act in furtherance of the conspiracy, is based on a mistaken view of the law. While there must be proof of an agreement or common purpose to violate the law, no overt act in furtherance of the conspiracy need be alleged or proved under this section. United States v. Robinson, 591 F.2d 1202, 1205 (5th Cir. 1979); United States v. Beasley, 519 F.2d 233, 247 (5th Cir. 1975), Vacated and remanded on other grounds, 425 U.S. 956, 96 S.Ct. 1736, 48 L.Ed.2d 201 (1976).
 
 
 27
 Taped phone calls between Stanley and Hyde offer more than a sufficient basis for the jury to have found that he knowingly agreed to participate in the marijuana conspiracy and was aware of its general scope. In one conversation, Hyde and Stanley arranged for Hyde to "make a drop" to Stanley "of ten" at a specified time and for Stanley to contact "Tony," who would "take three or four right off the bat." It was reasonable for the jury to interpret this conversation as an agreement in drug parlance[5] for Hyde to deliver ten pounds of marijuana to Stanley and for Stanley to pass three or four pounds of the marijuana to "Tony."
 
 
 28
 From the dialogue on another tape, the jury could have reasonably inferred that Stanley called Hyde because he was worried that Hyde had been apprehended transporting a consignment of drugs, having heard that day that federal narcotics agents had seized 20,000 pounds of marijuana in a raid at a bridge and that Stanley and Hyde agreed that Hyde would deliver Stanley's share of the newly obtained drugs to him on Wednesday night. This cumulative evidence renders Stanley's claims of insufficiency meritless.
 
 
 29
 In his challenge to the sufficiency of the evidence, Lonnie Mims asserts that the government failed to establish that he was aware of any conspirators other than Hyde and that therefore the government did not prove the single conspiracy it charged but rather proved a multiplicity of conspiracies between Hyde and various people. Mims admits that the evidence unquestionably showed that he obtained marijuana from Hyde for distribution and that Hyde was the "hub" of a "wheel" conspiracy of which Mims was a "spoke." Contrary to Mims' claim, however, the evidence was also sufficient to support the jury's conclusion that he had knowledge of the conspiracy's scope, shared its overall objective of distributing marijuana, and thus was guilty of participating in a single conspiracy. See, e. g., United States v. Perez, supra.
 
 
 30
 The jury could infer that Mims was aware of the general scope of the conspiracy from Anita Clancy's testimony that Hyde introduced her to Mims and that she then delivered marijuana obtained from Hyde to Mims on two occasions and from a taped conversation between Mims and Mrs. Hyde in which Mims asked for Hyde and inquired as to the whereabouts of "Joe," whom the jury could reasonably have believed was Joe Middlebrooks, another named conspirator. Also, in this conversation Mims revealed that he knew that "Joe" lived in Texas and traveled between there and Florida and that he understood that Hyde did not have "too many" people he could give "it" (marijuana) to who would "collect" for him. The jury was entitled to interpret these statements as establishing that Mims knew of conspirators other than Hyde, including Middlebrooks and Clancy, and was familiar with the workings of the distribution scheme. Thus, there was ample evidence for the jury to find that Mims intentionally participated in the single conspiracy charged.
 
 
 31
 In contrast to the persuasive case mustered against appellants Thompson, Eldridge, Harbin, Stanley, and Mims, the government produced only taped telephone conversations between O'Quinn and Hyde that failed to provide a basis for reasonably inferring that O'Quinn was himself involved in the marijuana distribution scheme. In these conversations, O'Quinn asked Hyde about the local drug scene, expressing interest in Hyde's drug-related activities and in those of other conspirators. However, the content and context of the conversations are consistent with O'Quinn's claim that he was unfamiliar with the conspiracy's drug transactions and thus strongly support the hypothesis that at the time of the phone calls O'Quinn was not a conspirator. These conversations also cannot support a conclusion that O'Quinn made the inquiries in the process of joining the conspiracy, since they can be understood as revealing no more than that he was curious about the illegal drug activities.
 
 
 32
 The taped conversations about cocaine between O'Quinn and Hyde and between Hyde and Joe Middlebrooks[6] similarly failed to provide evidence on which a jury could reasonably find that O'Quinn was guilty of a conspiracy to distribute that drug. In the first of these conversations, O'Quinn called Hyde and was told that "Joe" (Middlebrooks) had been waiting for him but had gone to Texas to purchase cocaine. In the course of this conversation, Hyde offered to take money from O'Quinn to Middlebrooks in order to enable O'Quinn to join in the cocaine purchase. While O'Quinn expressed interest in participating in Middlebrooks' cocaine transaction, depending on the quality and price of the drug and asked Hyde to have Middlebrooks call him, he did not agree during the call to have Hyde deliver his money. A later conversation between Hyde and Middlebrooks disclosed that O'Quinn had not contacted Middlebrooks in Texas to consummate the cocaine transaction. Not only was agreement between O'Quinn and another coconspirator regarding a cocaine transaction not proven, but O'Quinn's exploratory discussions as to participation in one drug purchase with Middlebrooks were consistent with O'Quinn's distributing cocaine as an independent dealer outside the conspiracy. Because the jury could not reasonably have concluded upon this evidence that O'Quinn was guilty of conspiracy to distribute either marijuana or cocaine, we must reverse his conviction.
 
 
 33
 Finally, we find merit in Roger Cleckler's assertion that there was insufficient evidence to support his conviction for conspiracy to distribute cocaine but reject his similar contention with respect to his conviction for conspiracy to distribute marijuana. The evidence against Cleckler on the marijuana count consists of his confession and the testimony of Anita Clancy. In a post-arrest admission, Cleckler stated that he began selling marijuana for Hyde some four to six months before Hyde's arrest. Cleckler admitted receiving as much as four to six pounds of marijuana at a time from Hyde and selling it to his friends in the area. According to Cleckler, Hyde would collect his money approximately two weeks after each delivery.
 
 
 34
 Cleckler's confession is substantially corroborated by the testimony of Anita Clancy that on two occasions when she was present Cleckler bought several pounds of marijuana from coconspirator Pruitt. See Smith v. United States, 348 U.S. 147, 156-59, 75 S.Ct. 194, 99 L.Ed. 192 (1954), and discussion Supra, pp. 780-781. Although Clancy's testimony does not coincide with Cleckler's confession on all points,[7] it does provide independent evidence of Cleckler's involvement with the alleged conspirators in distributing marijuana.[8] This in turn tends to establish the reliability of his confession such that a conviction based upon it can be sustained. Smith, supra ; See McCormick on Evidence § 158 at 346-49 (2d ed. 1972). Cleckler argues, however, that there is no evidence that he was aware of any conspirator other than Hyde and that therefore the government did not establish his knowing and voluntary participation in the "wheel" conspiracy it charged. However, the jury was entitled to credit Clancy's testimony that Cleckler purchased marijuana from conspirator Pruitt in the presence of other persons named as conspirators and to infer from this that Cleckler was aware of the involvement of these other conspirators and knowingly participated in the single conspiracy involving them.
 
 
 35
 However, the record fails to provide sufficient evidence to support the jury's verdict that Cleckler was guilty of conspiring to distribute cocaine. The sole proof of Cleckler's involvement in cocaine transactions was Clancy's testimony that Cleckler once sold three grams of cocaine to Pruitt, Hyde, Joe and Patricia Middlebrooks, herself, and her companion, which they personally consumed. This evidence does not establish that Cleckler conspired to distribute cocaine with O'Quinn, Jackie and Louis Hyde, Joe and Patricia Middlebrooks, and Petro Arenas, as charged. Rather, if believed, it would prove no more than that Cleckler sold cocaine to some of the named cocaine conspirators for personal use. We therefore reverse Cleckler's conviction on the second count of conspiring to possess cocaine with intent to distribute.
 
 
 36
 In summary, because we find no merit in the challenges of David Harbin, Lonnie Mims, William Stanley, Johnny Thompson, Descel Eldridge, Chuck Pruitt, and Roger Cleckler to their convictions of conspiracy to possess marijuana with intent to distribute, we affirm their convictions. Because we find that the record fails to establish sufficient evidence to support the conviction of Nolan O'Quinn of conspiracy to possess marijuana and cocaine with intent to distribute, we reverse his convictions; and because we find insufficient evidence to support the conviction of Roger Cleckler of conspiracy to possess cocaine with intent to distribute, we reverse his conviction on the second count.
 
 
 37
 AFFIRMED in part and REVERSED in part.
 
 
 
 [1]
 See United States v. Hyde, 574 F.2d 856 (5th Cir. 1978), describing the narcotics operation and law enforcement officers' investigation, culminating in arrests of appellants in the present case and in Hyde and affirming the convictions of appellants' alleged coconspirators in Hyde
 
 
 [2]
 Following the conclusion of the United States Attorney's argument, defendant Mims' attorney objected to the first statement, but the trial court overruled the objections. No objection was made at any time during the trial to the second statement of the prosecutor. However, if the second comment were "so grossly prejudicial that the harm could not be removed by objections or instructions," there is "no duty on the part of a defendant in a criminal case (to object and) to move for a mistrial," and the second statement's permissibility may be considered on appeal. Benham v. United States, 215 F.2d 472, 473 (5th Cir. 1954)
 
 
 [3]
 Hyde was convicted in a separate trial of being the "hub" of the wheel conspiracy involved in the present case. See United States v. Hyde, supra, note 1
 
 
 [4]
 See United States v. Malatesta, supra at 1382, abolishing the slight evidence rule as the standard for appellate review of sufficiency of evidence in conspiracy cases and requiring instead "substantial evidence" that, beyond a reasonable doubt, the accused knowingly participated in the conspiracy
 
 
 [5]
 The government introduced testimony by those familiar with the illegal drug world translating the taped calls
 
 
 [6]
 Joe Middlebrooks is a coconspirator not indicted in the present case but tried and convicted with Hyde in a separate trial. See United States v. Hyde, 574 F.2d 856 (5th Cir. 1978)
 
 
 [7]
 For example, while Cleckler denied receiving, buying, or selling cocaine, Clancy testified that the second drug transaction involving Cleckler that she witnessed included not only a purchase of marijuana by Cleckler but also a sale of three grams of cocaine by Cleckler to Pruitt and several other persons present at Pruitt's house. Moreover, Clancy testified that Cleckler bought marijuana from Pruitt, whereas Cleckler confessed to purchasing marijuana for resale from Hyde and did not mention involvement with any other conspirators
 
 
 [8]
 Cleckler's marijuana purchases reported by Clancy involved quantities that could suggest to a reasonable juror that he intended to resell the drugs and did not buy only for his personal use