UNITED STATES of America,
Plaintiff-Appellee,

v.

Mario PEREZ, Carlos Ruiz, Rigoberto
Rojas and Armando Ortiz,
Defendants-Appellants.

No. 80–5100.

United States Court of Appeals,
Fifth Circuit.
Unit B

June 15, 1981.

Rehearing and Rehearing En Banc
Denied Aug. 10, 1981.

James J. Hogan, Joseph Mincberg, Peter C. Clemente, Miami, Fla., for Perez.

Melvyn Kessler, L. Mark Dachs, Miami, Fla., for Ruiz, Rojas & Ortiz.

Karen L. Atkinson and Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla. for U.S.

Before DYER, TJOFLAT and FAY, Circuit Judges.

DYER, Circuit Judge:

Defendants appeal their convictions of conspiracy to distribute marijuana, 21 U.S.C. § 846, and possession with intent to distribute marijuana, 21 U.S.C. § 841(a)(1). We vacate the special parole term imposed on Perez under count one of the indictment and in all other respects we affirm.

On February 11, 1979, agent Meyers of the Palm Beach Florida Sheriffs office was conducting surveillance at 11317 Avery Road in North Palm Beach. A vessel, The Magnificent, about sixty feet in length, was docked in a canal at the rear of the residence. She was riding low in the water.

About seven-thirty that evening Meyers and agent Osleber of the Drug Enforcement Administration returned to the residence and Osleber smelled marijuana. Both agents heard a whirring noise and proceeded through an adjacent yard where they could view the back yard of the Avery Road residence. With a full moon lighting the area the agents saw a conveyor system running from the window of the vessel to the house. It was equipped with rollers and indoor-outdoor carpeting. The agents saw Perez at the window of the vessel passing burlap bales of marijuana from the vessel to the conveyor system. Ortiz was standing next to the conveyor system pushing the bales to Rojas, who, in turn, pushed the bales to Ruiz, who pushed the bales inside the house. All three men were wearing identical dark blue, short sleeved jumpsuits.

After watching the offloading operation for a few minutes Osleber made a remark to Meyers which was overheard by Perez. Perez immediately indicated to the others to be quiet and the men started to crawl away from the conveyor system.

There was a large clothesline in the backyard with sheets draped over it which screened the conveyor system. The agents appeared and announced that they were law enforcement officers and that everyone was under arrest. Ortiz, who started to run away, was seized and arrested. Meyers held him in custody. Rojas was seen crawling along the sidewalk and was diving over bale of marijuana in the doorway of the

house. Agent Osleber dragged Rojas back to agent Meyers who took custody of him. Osleber then saw Perez dive off the front of the vessel into the canal. As he was swimming away, Osleber pointed his rifle at Perez and ordered him back.

Agent Meyers saw Ruiz run into the house. It was dark except for a green chemical light that had been dropped on the floor. The agents heard noises coming from a bedroom, proceeded there, and announced their presence, but no one emerged. The agents saw Ruiz through a partially opened closet door, crouching and reaching toward the shelf above his head on which was a .30 caliber cut down carbine and a .357 magnum pistol, both loaded. Ruiz was wearing the same blue jumpsuit.

At the time of seizure sixteen bales of marijuana were on the conveyor system, one hundred and one bales were stacked in the living room, and three hundred and ten bales were still on the vessel. The total weight of all of the marijuana was 18,900 pounds.

All of the defendants concede on appeal that there was sufficient evidence to sustain their convictions under count two of the indictment, possession with intent to distribute marijuana, 21 U.S.C. § 841(a)(1). They collectively argue, however, that there was insufficient evidence to support a conviction for the conspiracy charged in count one, and further that it was error for the district court to submit a written copy of its charge to the jury. Perez contends that it was error for the court to exclude his expert witness because Perez' failure to abide by the standing discovery rules, and further that the parole term imposed upon him under count one is invalid. Ruiz asserts that it was error to admit in evidence the weapons found on the closet shelf under which he was hiding, and further that his motion for severance should have been granted.

■ At the outset we agree that Perez' special parole term imposed under count one must be vacated because he received consecutive sentences of two years special parole term on each count. In *Bifulco v. United States*, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980) the Court held that a special parole term may not be imposed for violations of 21 U.S.C. § 846. The concurrent sentence doctrine, *United States v. Warren*, 612 F.2d 887, 891–896, (5th Cir. 1980) (*en banc*) makes it unnecessary for us to consider the concurrent special parole term imposed on Ruiz, Rojas and Ortiz.

All of the defendants strongly argue that there was insufficient evidence to prove that they had the required intent to become a member of a conspiracy to distribute the marijuana. While they concede that they were in possession of it, they submit that there is no evidence of a plan to distribute it. We are unpersuaded. The defendants start with the sound premise that there must be proof beyond a reasonable doubt that a conspiracy existed, that they knew it, and with that knowledge voluntarily joined it. *United States v. Rodriguez*, 585 F.2d 1234 (5th Cir. 1978). They argue that on review we must find substantial evidence of the conspiracy as required by *United States v. Malatesta*, 590 F.2d 1379 (5th Cir. 1979). But they reach an unsound conclusion when they apply the facts to the premise.

■ Intentional participation in a criminal conspiracy need not be proved by direct evidence but may be inferred "from a development and a collocation of circumstances". *United States v. Harbin*, 601 F.2d 773 (5th Cir. 1979). Here we have the offloading of 18,900 pounds of marijuana from "The Magnificent" in a sophisticated operation utilizing a conveyor belt from the vessel to the house. Three of the defendants along the belt were dressed in the uniform of the day—dark blue jumpsuits. When Perez gave the alarm that they were being watched the three defendants attempted to flee, while Perez jumped overboard into the canal. The evidence of complicity is overwhelming. The defendants could not, even if they were chain smokers, personally consume this quantity of marijuana in their lifetime. It would be sheer sophistry to say that the defendants had not agreed to distribute the marijuana. In a parallel case where the defendants were

similarly charged with conspiracy to distribute, *United States v. Mann*, 615 F.2d 668 (5th Cir. 1980), the defendants were apprehended with over 22,500 pounds of marijuana in their possession "far too much for the personal consumption of four individuals. Having determined that defendants planned to import their cargo the jury was entitled to infer from the facts before it that some plan had been made for its disposition. As we have previously noted '[t]he very size of a ... cache can be sufficient to show intent to distribute...' *United States v. Rodriguez*, 585 F.2d 1234, 1236 (5th Cir. 1978) aff'd 612 F.2d 906 (5th Cir. 1980) (*en banc*); *United States v. Perry*, 480 F.2d 147 (5th Cir. 1973); *United States v. Mather*, 465 F.2d 1035 (5th Cir.), *cert. denied*, 409 U.S. 1085, 93 S.Ct. 685, 34 L.Ed.2d 672 (1972)." The factual picture painted here fits precisely into the frame of a conspiracy to distribute. Viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and accepting all reasonable inferences that support the jury verdict, *United States v. Becker*, 569 F.2d 951 (5th Cir. 1978), we find substantial evidence that sustains the jury's conclusion that the defendants entered into a conspiracy to distribute marijuana.

■ The defendants next argue that the district court, over their objections, submitted written instructions to the jury after having charged the jury to consider the charges as a whole. While we have condemned the practice, there is no showing that any prejudice resulted because of the submission of written instructions. *United States v. Hooper*, 575 F.2d 496 (5th Cir. 1978) is a full answer to the contention here made. There we said "The final ground of error put forth by defendant is that the district court incorrectly provided the jury with a written copy of the jury charges. In *United States v. Schilleci*, 545 F.2d 519 (5th Cir. 1977), this court expressed disapproval of the practice of furnishing the jury with written copies of the jury charge, but stated, however, that the practice was not error in itself'. *Id.* at 526. As none of the circumstances that created the risk of prejudice in *Schilleci* is present in this case we reject the defendants' contention." (footnote omitted).

■ Perez assigns error in the preclusion of his defense witness for a violation of a standing discovery order.[1] He argues that the action taken by the court under Rule 16(d)(2) of the Federal Rules of Criminal Procedure collides with his Fifth Amendment right to due process and his Sixth Amendment right to compulsory attendance of witnesses.

Doctor Antonio Rivero-Setien examined Perez on December 19, 1979. Four days before the trial date, January 3, 1980, the doctor's report was shown to the government. When the doctor was called as a witness by Perez the government's objection to his testimony was sustained. The proferred testimony was that his examination of Perez disclosed that he suffered from "acute back syndrome" and as a result Perez was not able to lift a weight of thirty to fifty pounds. However, he equivocated by saying that sometimes Perez had no pain, that "If at that time he was without pain, he would be able to swim." And again, sometimes he has no pain, is in good condition, and does not need crutches. Other times he has been in worse condition, and sometimes moving in the bed suddenly, and so forth, and so his condition can worsen, sometimes."

We entertain no doubt but that Perez' counsel was in violation of the discovery order by waiting from December 19 to December 30, 1979, to disclose the doctor's statement to the government, particularly with the New Years holiday intervening before trial on January 3, 1980. Thus it was within the sound discretion of the district court to mete out appropriate relief. *United States v. Bockius*, 564 F.2d 1193 (5th Cir. 1977); *United States v. Bullock*, 551

---

1. The standing discovery order provides in pertinent part that it shall be the continuing duty for counsel for both sides to immediately reveal to opposing counsel all reports of physical or mental examinations.

F.2d 1377 (5th Cir. 1977); *Gevinson v. United States*, 358 F.2d 761 (5th Cir. 1966); *United States v. Saitta*, 443 F.2d 830 (5th Cir.), *cert. denied*, 404 U.S. 938, 92 S.Ct. 269, 30 L.Ed.2d 250 (1971). But "the compulsory process clause of the sixth amendment forbids the exclusion of otherwise admissible evidence solely as a sanction to enforce discovery rules or orders against criminal defendants." *United States v. Davis*, 639 F.2d 239 at 243 (5th Cir. 1981).

It is self evident, however, that this was not a close case. The evidence of guilt was formidable and the doctor's proferred testimony was equivocal—that Perez' back was not always disfunctional. Perez was observed lifting and placing on the conveyor belt bale after bale of marijuana. He jumped into the canal and started to swim away in an attempt to escape. We conclude that although the court should have imposed a lesser sanction than the preclusion of the witness, on the facts and in the circumstances of this case, the failure to do so was harmless error beyond a reasonable doubt. *United States v. Arcentales*, 532 F.2d 1046 (5th Cir. 1976).

■ Ruiz asserts error in the denial of his motion for severance arguing that it deprived him of material exculpatory testimony of his codefendant Rojas. At the motion to suppress hearing held on September 4, 1979, prior to the time of trial in January 1980, Ruiz called Rojas as a witness. The magistrate advised counsel that any testimony offered by any of the defendants could not be used against them at trial except as impeachment. Rojas then testified that when Ruiz arrived at the house he looked and acted sick and went to bed shortly thereafter.

No written or oral motion for severance was made or filed by Ruiz at anytime before the government rested its case. Then for the first time Ruiz' counsel moved for a judgment of acquittal and for a severance. Ruiz called Rojas as a witness outside the presence of the jury and Rojas stated his intent to invoke his Fifth Amendment rights with regard to all questions put to

him concerning the crime. Ruiz then argued that he should be granted a severance or alternatively should be allowed to introduce the former testimony of Rojas. The district court denied the motions.[2] We find no abuse of discretion in the trial court's ruling.

In the seminal case of *Byrd v. Wainwright*, 428 F.2d 1017 (5th Cir. 1970), we pointed out several areas of inquiry which a trial court should pursue when it is presented with a motion to sever based on the desire to offer exculpatory testimony of a codefendant, among which were "[t]o what extent, and in what manner, must it be shown that if severance is granted there is likelihood that the codefendant will testify." Further, "[w]hat are the demands of effective judicial administration and economy of judicial effort? Related to this is the timeliness in raising the question of severance" (footnote omitted). Addressing these inquiries in reverse order we find that there was a failure to timely present the motion. Ruiz knew four months in advance of the trial what Rojas testified to on the motion to suppress, yet no motion for severance was made until after the government rested and Ruiz' motion for acquittal had been denied. The motion to sever at this late date was untimely. *United States v. Metz*, 608 F.2d 147 (5th Cir. 1979). *Kolod v. United States*, 371 F.2d 983 (10th Cir. 1967). Moreover, Ruiz did not meet the burden of showing that there was a likelihood that Rojas would testify if Ruiz' motion for a severance was granted. "The court is not required to sever when the possibility of the codefendant's testimony is merely colorable or there is no showing than it is anything more than a gleam of possibility in the defendant's eye." *Byrd, supra* at 1022. The limited testimony of Rojas at the suppression hearing after a promise of immunity from its affirmative use, especially after Rojas' claim of his Fifth Amendment privilege outside the presence of the jury at the time of trial is a strong indication that Rojas would not have taken the stand if Ruiz had been granted a separate trial.

**2.** Ruiz did not assign as error on appeal the exclusion of the former testimony of Rojas.

In a well documented and exhaustive opinion by Judge Thornberry in *United States v. Morrow*, 537 F.2d 120 (5th Cir. 1976) it was emphasized that "the grant or denial of a motion for severance rests in the sound discretion of the trial judge. Consistent with this discretion, which is necessarily wide, appellants carry a heavy burden to show the denial of their motions for severance also denied them a fair trial. Absent an abuse of discretion, the ruling of the trial judge will not be disturbed on appeal." We find no abuse of discretion here.

█ Finally Ruiz contends that the two loaded weapons introduced into evidence against him had, at best, only slightly probative value which was outweighed by their potential prejudice. He argues that prejudice arose both because the government failed to inform the jury that the house belonged to codefendant Perez and because of the inflammatory nature of the weapons themselves. The agents saw Ruiz in a blue jumpsuit (similar to those worn by the others), crouching in the closet and reaching for the shelf above his head where the two loaded guns were located. We are unimpressed with the argument that given these facts it could have made a difference to the jury to know that the house was owned by Perez, not Ruiz. That is beside the point— the point is that Ruiz was there and reaching toward the weapons.

The defendants were unloading 18,900 pounds of marijuana. It is certainly fair to assume that anyone engaging in a transaction of this magnitude would take steps against having the contraband or the purchase money stolen. *United States v. Pentado*, 463 F.2d 355 (5th Cir. 1972). Moreover, the agents were entitled, under the circumstances, to be apprehensive about their own safety. As the Ninth Circuit said in *United States v. Kearney*, 560 F.2d 1358 (9th Cir. 1977), "[p]ossession of a firearm demonstrates the likelihood that a defendant took steps to prevent contraband or money from being stolen." We endorse the Second Circuit's observation that "[e]xperience on the trial and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent as they keep scales [which were also found in the closet], glassine bags, cutting equipment, and other narcotic equipment." *United States v. Wiener*, 534 F.2d 15 (2nd Cir. 1976).

The guns were relevant to the issues upon which Ruiz was tried and the district court did not abuse its discretion in holding that their probative weight was not overbalanced by the inflammatory tendency of the guns as evidence. *United States v. Ashley*, 555 F.2d 462 (5th Cir. 1977). See *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (*en banc*).

The special parole term imposed on Perez under count one of the indictment is vacated. The judgments of conviction are, in all other respects, AFFIRMED.

FAY, Circuit Judge, specially concurring:

I agree wholeheartedly with Judge Dyer's opinion for the court but wish to add this statement regarding the submission of the trial court's charges to the jury. While we are bound by *Schilleci* as we pointed out in *United States v. Johnson*, 558 F.2d 744 (5th Cir. 1977), that opinion must be read in light of its very peculiar fact situation and the combination of errors requiring reversal. As noted by Judge Dyer, the language in *Schilleci* states that the practice is not error in itself. *Schilleci* does express disapproval of the practice of furnishing the jury with written copies of the jury charge. That precise question has never been considered by our court *en banc*.

Personally, I feel the practice of furnishing a copy of the court's instructions to the jury is both sound and proper. Additionally, I seriously doubt that the criticism of the practice found in *Schilleci* represents the current thinking of most trial and appellate judges within our circuit.