Grafton
No. 82-583
No. 83-344

## THE STATE OF NEW HAMPSHIRE

v.

## FRANCIS A. LOVELY

April 9, 1984

*Gregory H. Smith*, attorney general (*Amy L. Ignatius*, attorney, on the brief and orally), for the State.

*Peter Karl Marsh*, of Concord, and *Ronald Ian Segal*, of Everett, Massachusetts (*Mr. Marsh* and *Mr. Segal* on the brief, and *Mr. Marsh* orally), for the defendant.

BATCHELDER, J.   The defendant appealed from a jury verdict finding him guilty of twelve counts of aggravated felonious sexual assault, RSA 632-A:2, IV (Supp. 1983), and seven counts of sexual assault, RSA 632-A:4 (Supp. 1983), in the Superior Court (*Dunn, J.*). We have consolidated that appeal with the defendant's later appeal from the denial of his motion to set aside the jury's verdict, made seven months after the trial. The allegations contained in the indictments which were the subject of the trial concern one victim who had been coerced into sexual activity by and with the defendant.

The defendant raises five claims of error and asks that we reverse his conviction. For the reasons which follow, we affirm.

The evidence adduced at trial establishes that the defendant managed a State liquor store in West Lebanon. According to the victim's testimony, the defendant, in September 1981, picked him up while he was hitchhiking. Some days later, the victim appeared at the liquor store to borrow some money from the defendant. The defendant lent the victim $10, and they discussed the possibility of employment at the liquor store.

On September 29, 1981, the defendant assisted the victim in completing an application for employment. Although the victim was initially told that the application would have to be processed through the Concord office, he was permitted to start work that afternoon. The victim testified that he had been living out of his car at this time, but that after starting work he, with the defendant's assistance, was able to rent a room. The defendant paid the rent ($30 weekly) for most of the ensuing three months, notwithstanding the fact that the victim actually resided in the defendant's home, along with the defendant's family. In addition, in October 1981, the defendant paid $60 to the Hanover police as restitution for a theft committed by the victim.

The victim testified that from October 1981 to January 1982, he spent most of each day in the defendant's office at the liquor store,

doing little work but receiving full pay. Typically, the defendant took the victim to lunch and on coffee breaks as his guest. The defendant also drove the victim to and from the liquor store each day.

The victim testified that, during this period, he had relationships with two women. The defendant expressed misgivings about those relationships and took steps to thwart them. One of these women testified at trial that the defendant had told her that he loved the victim, and that they were "bed buddies" and wished to spend all their time together.

The victim testified that the defendant took photographs of him while he was unclothed. Two photographs of the victim (one in which he was fully clothed and the other in which he was nude except for a towel around his waist) were found on the defendant's dresser by police during a search of the defendant's home. These photographs were introduced into evidence. The victim also testified that the defendant forced him to watch a film which depicted various homosexual acts, while admonishing the victim that he could be a good lover if he would only learn what to do. A police officer who searched the defendant's home testified that a film was found there which corresponded with the film described by the victim.

The indictments alleged twenty-three incidents during which the defendant coerced the victim into engaging in sexual acts, involving masturbation, sodomy or fellatio. The indictments alleged that the defendant threatened the victim with loss of his employment and housing, and further threatened to institute criminal charges against him if the victim did not submit. The victim testified concerning these incidents with the assistance of a sixty-five-page statement he had written while in the custody of the Lebanon police. During trial, three of the fifteen felony counts were dismissed due to insufficient evidence. On October 25, 1982, the jury returned guilty verdicts on the remaining twelve felony counts and on seven of the eight misdemeanor counts.

The defendant first argues that the threats to which the victim testified do not, as a matter of law, constitute threats of retaliation within the meaning of RSA 632-A:2, IV (Supp. 1983). This statute prohibits sexual penetration "[w]hen the actor coerces the victim to submit by threatening to retaliate against the victim, or any other person, and the victim believes that the actor has the ability to execute these threats in the future." *Id.; see* RSA 632-A:4 (Supp. 1983) (making it a misdemeanor for any person to subject another "to sexual contact under any of the circumstances named in RSA 632-A:2"). The defendant raised this contention at trial through motions to quash the indictments, to dismiss and to set aside the verdict.

The defendant maintains that the threats of retaliation envisioned by the legislature when it enacted the statute do not include the threats of financial retribution which the indictments alleged and to which the victim testified. Rather, the defendant argues, RSA 632-A:2, IV (Supp. 1983) prohibits the coercive use of threats of violence. Consequently, reasons the defendant, since neither the indictments nor the evidence alleged the types of personally endangering threats proscribed by the statute, the defendant's conviction cannot stand.

The victim testified at great length about the circumstances attending his encounters with the defendant. The following passage from the record fairly summarizes the type of threats that constituted the coercion to which he was subjected:

> "Q. Now, Mr. [victim], in all these incidents that you have been discussing here in court for the past two days, was it just one thing that you were fearful of that Mr. Lovely might do or was it a combination of things?
>
> A. Three or four things, combination.
>
> Q. What were, . . . what was the combination of things that you were fearful of?
>
> A. Loss of the job, the housing, and being taken to court for money I had owed him.
>
> Q. Was there anything else?
>
> A. And that he was protecting me, keeping me out of trouble with the law."

The State contends that the threats summarized above fall within the definition of "retaliation" and, therefore, that their use to procure sexual penetration and contact is prohibited by RSA 632-A:2 and :4 (Supp. 1983).

■ Retaliation is defined to mean "threats of future physical or mental punishment, kidnapping, false imprisonment, extortion or public humiliation or disgrace." RSA 632-A:1, II (Supp. 1983). In the light of these specific types of retaliatory threats proscribed by the Code, we cannot agree with the defendant's contention that the Code applies only to violent or personally endangering threats. Threats of mental punishment, extortion (as defined by RSA 637:5, II, to include threats of economic reprisal) or public humiliation or disgrace clearly extend beyond threats of physical violence to reach acts that undermine consent through the use of non-violent coercion. *See generally* ALI MODEL PENAL CODE AND COMMENTARIES § 213.1, at 312 (1980).

■ Examining the victim's testimony in the light most favorable to the State, we conclude as a matter of law that the threats directed at the victim amounted to threats of retaliation within the meaning of RSA 632-A:1, II, and :2, IV (Supp. 1983). Consequently, the ultimate question of guilt of the crimes charged remained with the jury.

The second issue raised by the defendant on this appeal concerns his claim that he was deprived of the effective assistance of counsel because his trial counsel failed to preserve an adequate record of certain conferences between counsel and the court at the bench during trial. The defendant argues that the failure to insure that all bench conferences are recorded prevents meaningful appellate review, by depriving the appellate court of the substance of the conference, along with any rulings, together with the reasons therefor, made by the trial judge during the conference.

■ The defendant points to only two instances where his trial counsel failed to record bench conferences to his prejudice. Our reading of the record before and after the point where the unrecorded bench conferences are indicated fails to disclose any possible prejudice redounding to the defendant from not having these conferences recorded. *Cf. State v. Staples*, 121 N.H. 959, 964, 437 A.2d 266, 268 (1981). Viewing the record as a whole, we hold that the defendant was not deprived of the effective assistance of counsel at his trial. *See State v. Guaraldi*, 124 N.H. 93, 100, 467 A.2d 233, 237 (1983).

The defendant's third claim of error concerns the prosecutor's statement during his closing argument that the defendant had failed to produce any witnesses to testify to the defendant's good character:

> "Now, the defendant's case revolved around certain people who did not know Mr. Lovely and who came in here and only knew [the victim]. I think it is very interesting and very revealing as to who they called as versus who they did not call. Where were all the witnesses to come in here and say what a great guy Mr. Lovely is? Where were all of Mr. Lovely's neighbors? Where were all of Mr. Lovely's co-workers?"

Behind this statement, argues the defendant, is the adverse inference that the defendant was of such bad character that no such witnesses could be produced. The defendant maintains that with this comment the prosecution improperly injected the defendant's character into the trial and burdened the defendant's right to remain

silent and not to produce any evidence. *See* N.H. CONST. pt. I, art. 15; U.S. CONST. amend. V; *State v. Kelly*, 113 N.H. 222, 223, 306 A.2d 58, 59 (1973); *cf. State v. Ramos*, 121 N.H. 863, 868–70, 435 A.2d 1122, 1125–26 (1981).

■ A prosecutor has the duty to act as a zealous advocate in presenting the State's case. However, a "public prosecutor 'differs from the usual advocate [in that] his duty is to seek justice, not merely to convict.'" *State v. Preston*, 121 N.H. 147, 151, 427 A.2d 32, 34 (1981) (quoting ABA CODE OF PROFESSIONAL RESPONSIBILITY, EC 7-13 (1980)). Consequently, we hold a prosecutor to a high standard of conduct and integrity. *State v. Scarlett*, 118 N.H. 904, 905, 395 A.2d 1244, 1246 (1978).

■ Although the prosecutor did not directly comment on the defendant's failure to testify, we have no difficulty in concluding that the remarks in question were improper. *See United States v. Harbin*, 601 F.2d 773, 777 (5th Cir.), *cert. denied*, 444 U.S. 954 (1979). Once they were made, however, defense counsel objected, and the court promptly instructed the jury that it was to disregard the remarks and that the defendant was presumptively innocent and did not have to produce any evidence on his behalf. It is our opinion that the trial court's instructions cured any harm caused by the prosecutor's impropriety. *See State v. Fowler*, 110 N.H. 110, 112–13, 261 A.2d 429, 430–31 (1970).

The defendant next argues error in the denial of his motion to set aside the verdict. He argues that the verdict was against the weight of the evidence because the testimony of the State's chief witness, the victim, was uncorroborated and untrustworthy.

■ Viewing the evidence and all the reasonable inferences derived therefrom most favorably to the State, we are satisfied that the evidence is sufficient to support a guilty verdict and that a jury could reasonably so find beyond a reasonable doubt. *See State v. Merski*, 123 N.H. 564, 569, 465 A.2d 491, 495 (1983); *State v. Bird*, 122 N.H. 10, 17, 440 A.2d 441, 445 (1982). Accordingly, we find no abuse of discretion in the trial court's denial of the defendant's motion to set aside the verdict. *See State v. Houle*, 120 N.H. 160, 161, 412 A.2d 736, 737 (1980).

The defendant's final ground for appeal is the prosecution's alleged failure to disclose that the prosecution had entered into plea negotiations with the victim, with respect to criminal charges pending against the victim, prior to the victim's testifying at trial. He claims that the trial court's failure to grant his motion to set aside the verdict, because of this nondisclosure and the victim's and the

prosecutor's misrepresentations with respect to plea negotiations, was reversible error. *See State v. Breest*, 118 N.H. 416, 387 A.2d 643 (1978), *cert. denied*, 442 U.S. 931 (1979).

At the time of trial, the victim had pending against him in Grafton and Sullivan Counties a number of criminal charges, including theft and burglary charges. His allegations concerning the defendant came to light while he was under arrest at the Lebanon police station on an assault charge.

During cross-examination, defense counsel asked the victim if any plea negotiations, concerning the pending charges, had been discussed. The questioning went as follows:

> "Q. You are presently facing criminal charges, aren't you?
>
> A. Yes.
>
> Q. And have you discussed any kind of plea because of your testimony in this case?
>
> A. No.
>
> Q. Has there been any kind of plea negotiations entered into?
>
> A. No.
>
> Q. There has been no discussion about a plea negotiation?
>
> A. No.
>
> Q. None at all?
>
> A. No."

At this point, defense counsel directed the victim's attention to a motion, filed by the victim's counsel, to consolidate the indictments pending against the victim in Sullivan County with those indictments pending in Grafton County. A copy of this motion was later entered into evidence as an exhibit. Defense counsel in his cross-examination emphasized the following language contained in that motion: "Because of plea negotiations in Grafton County the disposition of these charges at the same time in the same court would serve both the interest and the convenience and the ends of justice. 3. Due to the similar nature of the charges the defendant wishes to dispose of all charges in one court."

Defense counsel then inquired:

> "Q. Now, you tell me there have been no plea negotiations in Grafton County?

A. You stated it for this case. There hasn't been any plea for this case, as in if I testified that would give me this or that.

Q. There haven't been any plea negotiations in your cases?

A. In my case. We have talked, yes.

Q. And this case never came up during those discussions?

A. No. Not that I can think of."

The defendant claims that the victim was not truthful in his answers. He also faults the prosecutor for his failure to correct the misrepresentations of his witness. The effect of this failure, argues the defendant, was further compounded by the prosecutor's suggestion, during his closing argument, that the victim's testimony was not inaccurate and by his statement that the transfer of the indictments against the victim from Sullivan to Grafton County was done only for reasons of judicial economy. Finally, the defendant charges that the prosecutor misrepresented his knowledge of and role in the plea negotiations with his statement during closing: "[The victim] told you that there were no promises and in fact there is no evidence to the contrary."

The defendant, through his trial counsel, moved to set aside the verdict and requested a new trial on May 13, 1983, seven months after the defendant's trial. By this date, as the State concedes in its brief, the victim had pled guilty in the Grafton County Superior Court to four Grafton County and Sullivan County indictments. He was sentenced to four to eight years in the New Hampshire State Prison, suspended on condition that he successfully complete the treatment program at Marathon House, plus restitution to the victims of his crimes and to the State for counsel fees.

The only support for the accuracy of the defendant's allegations with respect to plea negotiations is found in the transcript of the May 13 hearing. The trial court asked Grafton County Attorney John B. Eames, the prosecutor of the indictments against the victim, "[w]ere there any plea negotiations going on at that time?" Mr. Eames replied:

"Your Honor, as I recollect nothing had been finalized with [the victim] during the course of the trial and when [the victim] testified he was not aware of any. I believe he was probably testifying truthfully because I had not finalized anything myself so I don't see how [the victim] would

know something before I did. After the trial we finalized the plea for [the victim]."

From this statement, it seems clear that there had been some discussions concerning the possibility of the State's recommending a certain disposition in exchange for a plea but that no negotiated plea had, as of the time of trial, taken place, and no promises had been made to the victim. In other words, there had been negotiations toward a plea, but they had not culminated in an agreement.

From our reading of the record, with an eye toward reconciling the various statements made, it is apparent that two different meanings were given to the term "plea negotiations." The defendant equated the term with discussions concerning possible disposition of the charges, while the victim equated the term with an actual, "finalized" agreement. This distinction is most apparent in the victim's testimony when he acknowledged that "[w]e have talked, yes."

With this acknowledgment by the victim, the jury was made aware that some kind of discussion had taken place. This fact would have been emphasized by the language referring to plea negotiations in the victim's motion to consolidate. Having been made aware of these discussions, the jury was informed of the ultimate point: that the victim had a possible motive not to tell the truth.

■ Because the victim conceded that discussions had taken place, the prosecutor had no duty to correct anything the victim stated, assuming that no plea agreement had been finalized. *Cf. United States v. Butler*, 567 F.2d 885 (9th Cir. 1978) (witness had been promised that charges pending against him would be dismissed; at trial he stated that charges were not going to be dismissed; new trial ordered).

Trial counsel for the defense, arguing first to the jury, launched a formidable attack on the victim's credibility, pointing out the numerous reasons why the jury could heavily discount the victim's testimony. As part of this attack, counsel stated:

"[I]t appears that whenever [the victim] is arrested he tells the police what he did. . . . There is no evidence that he tells the truth beyond that, and he only does that, I submit because he hopes to get something out of it. He hopes that if [he] cooperates with the State that the State will be good to him when it comes time to prosecute him, and that they will not put him in jail. It has worked in the past—he has never gone to jail yet, and probably he hopes it will work in the future."

■ It was after being assailed by defense counsel's able argu-

ments that the prosecutor offered his own attack. In closing, the prosecution argued that there was no evidence of promises made to the victim, and then directed the jury's attention to the motion to consolidate:

> "And also you will notice that there is nothing in there that says anything about any promises or any agreement. All it is just, for economy of justice, for all of the cases brought up to one court. That is all that is—nothing about any deals being made with [the victim]."

Although the reference to "economy of justice" may not be a model of ingenuousness, it constitutes a possible reading of the victim's motion. We see nothing in the prosecutor's remarks that go beyond the realm of determined advocacy into misrepresentation or misconduct.

Accordingly, we see no abuse of discretion in the trial court's refusal to grant the defendant's motion to set aside the verdict.

*Affirmed.*

DOUGLAS, J., did not sit; the others concurred.