UNITED STATES of America,
Plaintiff-Appellee,

v.

Richard Anthony BADOLATO, Dean
Quarnstrom, and Richard Vaughn,
Defendants-Appellants.

No. 81–7692.

United States Court of Appeals,
Eleventh Circuit.

April 1, 1983.

Rehearing and Rehearing En Banc
Denied June 8, 1983.

Ronald A. Dion, North Miami Beach, Fla., for Badolato & Vaughn.

Jack Friday, Savannah, Ga., for Quarnstrom.

Clyde M. Taylor, Jr., Tallahassee, Fla., for Badolato.

William H. McAbee, II, and Melissa S. Mundell, Asst. U.S. Attys., Savannah, Ga., for plaintiff-appellee.

Before HILL and ANDERSON, Circuit Judges, and LYNNE *, District Judge.

JAMES C. HILL, Circuit Judge:

Appellants Richard Badolato, Richard Vaughn, and Dean Quarnstrom were found guilty of conspiring to import and possess marijuana in violation of 21 U.S.C. §§ 841(a)(1), 846, 952(a), 963. Vaughn and Quarnstrom also were found guilty of violating 18 U.S.C. §§ 1952, 2, relating to Interstate Transportation in Aid of Racketeering, and Vaughn was found to have violated 21 U.S.C. § 843(b)'s prohibition against Use of Communication to Facilitate Possession. The three men were tried together in district court, and each has appealed. Upon review, we affirm each conviction.

## I.

As part of an ongoing investigation of federal drug law violations, four DEA agents posed as marijuana off-loaders with access to landing and storage facilities. On September 7, 1980, Richard Vaughn contacted one of the agents in Miami, Florida to hire them to off-load a boat containing marijuana and methaqualone tablets. Vaughn had a number of conversations with agents in regard to these arrangements, and on September 9, 1980, he introduced Dean Quarnstrom to the agents as the man who was going to handle the trucks and buyers. At this meeting, Quarnstrom informed the agents that he had a friend with two trucks ready, that he had warehouses set up in Jupiter, Florida and Fort Lauderdale, and that he had buyers who could be available within twenty-four hours.

On October 9, 1980, the DEA agents met with all three appellants in Savannah, Georgia to discuss and view possible off-load and stash sites for an operation in Georgia. After travelling to a number of potential storage sites, they all agreed on a remote stable as an ideal storage area. The group then proceeded to a water bank, which Vaughn approved as a docking site. The discussions between the agents and appellants indicated that Vaughn was specifically interested in the various means of importation, while Badolato and Quarnstrom were more concerned with the logistics of distribution once the marijuana was safely in the country.[1]

---

* Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. The details of the arrangements were quite specific. Vaughn discussed the amount of boat traffic on the river, how they would have to build a ramp to get the marijuana off the boat, water depth and current patterns, and transportation from the river bank to the main dirt road for transport to the stash site. Badolato wanted a stash site closer to the water and wanted to know how the trucks could move back out to the interstate. They ultimately agreed to compartmentalize the operation by having the agent's men take the truck to the stash area, load it, and return it to a truck stop where Badolato's drivers could take over. Badolato also suggested that guards be placed on U.S. 17 to ensure that no traffic was coming as agents pulled out of the gate onto the highway to go to the truck stop. Quarnstrom was con-

After travelling to potential stash sites, the group eventually arrived at a picnic area on Jekyll Island. Here they began to hammer out the details of the operation. They discussed where the agents would meet Vaughn's ship, how the marijuana would be weighed at the stable area, and finally distribution of the contraband. Quarnstrom indicated that he could take 8,000 pounds in one large van to the Atlanta area, and wanted to know the location of all weigh stations between the stable site and Atlanta. Badolato advised that the trucks be kept in Jacksonville area until the time and date of arrival of the vessel was confirmed. This was to avoid arousal of local suspicions. According to the testimony of one agent, most of the details of the plan were solidified at Jekyll Island. Although there was no definite agreement as to price, quantity, or quality of marijuana, it was agreed that the off-loaders would receive $25 per pound for the marijuana they handled. In addition, Vaughn privately indicated to the agents that Badolato and Quarnstrom agreed to pay him $265 per pound.

On February 7, 1980, Vaughn and Badolato again met with the agents in an apartment in Miami to discuss another drug deal whereby Vaughn and Badolato would purchase marijuana from the DEA agents. Vaughn and Badolato evaluated the quality of a sample bale of marijuana and negotiated for a price; however, they made no commitment to purchase it. At this meeting, Vaughn also explained that the October deal never materialized because his organization was having problems with its equipment. This entire meeting was videotaped and subsequently introduced into evidence.

At trial, Badolato's principle argument was that because there was no agreement as to price, quality or quantity, he could not be found guilty of a conspiracy. Vaughn, a treasure salvager, maintained that he was the target of government conspiracy to frame him for interfering in the treasure salvaging rights of a competitor, Bob Abplanalp. Vaughn claimed that Abplanalp, through his friends Richard Nixon and John Mitchell, was using the Justice Department to persecute Vaughn. Finally, Quarnstrom argued that he was doing undercover research for a movie script about large scale drug operations and had no intent to engage in the conspiracy. In furtherance of his defense, Quarnstrom sought to introduce an educational documentary on drug abuse among teenagers which he had produced. The trial court, however, refused to admit the film because of its prejudicial impact on Badolato and Vaughn.

## II.

On appeal, appellants first challenge the sufficiency of the evidence supporting their convictions. The applicable standard of review for a sufficiency challenge recently was enunciated in *United States v. Bell,* 678 F.2d 547 (5th Cir. Unit B) (en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982):

> It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.

678 F.2d at 549 (footnote omitted). In applying this standard we also are mindful that the evidence and all reasonable inferences are to be viewed in a light most favorable to the Government. *Id. see also Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

 Fortunately, or unfortunately as the case may be, this circuit has had the opportunity to develop a substantial body of case law with respect to the requirements necessary to sustain a conviction for drug conspiracy. The most basic element of such

---

cerned about the need for a power generator for portable lighting, electronic scale, and covers for the stable. He also urged the group to

consider an escape route in the event that police became involved.

a conspiracy is an agreement between two or more persons to violate federal narcotic laws. *United States v. Lee,* 694 F.2d 649, 652 (11th Cir.1983), *United States v. Tamargo,* 672 F.2d 887, 889 (11th Cir.1982), *cert. denied,* —— U.S. ——,. 103 S.Ct. 141, 74 L.Ed.2d 119 (1982). Although in most conspiracy cases the Government also must demonstrate an overt act in furtherance of. the conspiracy, no such requirement exists when the charge involves a drug conspiracy in violation of 21 U.S.C. § 846. *United States v. Cuni,* 689 F.2d 1353, 1356 (11th Cir.1982); *United States v. Spradlen,* 662 F.2d 724, 727 (11th Cir.1981); *United States v. Diaz,* 655 F.2d 580, 584 (5th Cir.1981), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982). What the Government must demonstrate is that a conspiracy existed, that the defendant had knowledge of it, and that he or she voluntarily became part of it. *United States v. Lippner,* 676 F.2d 456, 466 (11th Cir.1982); *United States v. Malatesta,* 590 F.2d 1379, 1381 (5th Cir.) (en banc), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979).

■ It also is clear that the existence of a drug conspiracy may be demonstrated by circumstantial evidence such as inferences from the conduct of the defendant or the circumstances indicating a scheme or plan. *Lee,* 694 F.2d at 652; *Lippner,* 676 F.2d at 466; *Spradlen,* 662 F.2d at 727. Moreover, the requirement of knowledge of the conspiracy agreement refers simply to knowledge of the essential objective of the conspiracy. *Tamargo,* 672 F.2d at 889; *United States v. Alvarez,* 625 F.2d 1196, 1198 (5th Cir.1980) (en banc),. *cert. denied,* 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981). To be found guilty, a defendant need not have knowledge of all the details of the conspiracy, and may play only a minor role in the total operation. *Lee,* 694 F.2d at 652; *United States v. Nickerson,* 669 F.2d 1016, 1022 (11th Cir.1982); *Alvarez,* 625 F.2d at 1198.

### A.

■ Bearing in mind these principles, we turn first to the contention of Badolato and Vaughn that no agreement ever was finalized. In particular, Badolato maintains that he was not involved in the September discussions between the agents and Vaughn and Quarnstrom, and that he did not agree to buy any marijuana until he saw the merchandise. Appellants also maintain that the group never agreed on the quality, quantity, or purchase price of the marijuana to be imported. Notwithstanding these contentions, the record reveals substantial evidence of an agreement. The group agreed on an off-load site, a storage site, and many of the practical details involved in moving the marijuana. Although Badolato's discussions with the agents concerned distribution, while Vaughn was the dominant figure in the importation discussions, knowledge of all the details of the conspiracy is not necessary to sustain a conviction. *See, e.g., Lee, supra; United States v. Davis,* 679 F.2d 845 (11th Cir.1982). The evidence indicated that Vaughn's role was to handle shipping the marijuana into the country, while Badolato and Quarnstrom were to provide a market for the merchandise.

Although actual price, quantity and quality were not finalized when the group met in Georgia, testimony indicated that such details often are left unresolved. This is because price depends upon quality, which only can be determined at the time of delivery. Inspection, weigh-in, and division of marijuana was to take place at the storage area agreed upon by the group. Tentative plans indicated that Vaughn's initial vessel would deliver 18,000 pounds of marijuana. Quarnstrom was to take 8,000 pounds of that for distribution in Atlanta while Badolato was to distribute the remainder.[2] In terms of price, it was agreed that the off-loaders would receive $25 per pound. Vaughn also indicated that Quarnstrom and Badolato would be willing to pay approximately $265 per pound. More definite plans could not be made until the marijuana

---

2. Badolato specifically informed the agents that he had recreational vehicles which could move

at least several hundred pounds of marijuana into an area in Pennsylvania.

was available for inspection. Indeed, at the subsequent video-taped meetings the following February, Vaughn explained that the October plans were not consummated because his organization "kept pulling equipment out from under him," record, vol. 8 at 201, and not because any lack of agreement on the part of members of the group.[3]

From these representations and the additional testimony and evidence proffered at trial, a reasonable jury could certainly have found the existence of a conspiracy, knowledge of the conspiracy on the part of each defendant, and that each defendant voluntarily played an active role. *See Lippner, supra.* Thus, applying the *Bell* standard, the evidence was sufficient to support the jury's verdict.

### B.

Appellant Quarnstrom raises an additional defense based upon insufficiency of the evidence. Although he acknowledges meeting and discussing plans for the operation in Georgia, Quarnstrom's position throughout these proceedings has been that his only purpose in associating with Badolato and Vaughn was to gather information for a movie script about big time drug smugglers. Because he was only present to acquire an insider's knowledge of the narcotics scene, Quarnstrom contends that he lacked the intent to advance an illegal purpose that is required for a conspiracy conviction.[4]

The Government does not deny that Quarnstrom is an investigative journalist and film-maker by profession, and we are not unsympathetic to this position; how-ever, his argument on appeal confuses the intent to enter into an agreement to violate federal drug laws with the purpose or goal which motivates one to enter into such an agreement. Quarnstrom was convicted of the illegal act of agreeing to violate the federal drug laws. The conspiracy of which he was convicted is distinct from any substantive offense. Conspiracy laws are designed to protect society from the dangers of concerted criminal activity. They identify the agreement itself as a sufficient threat to the social order so as to permit the imposition of criminal sanctions. *United States v. Feola,* 420 U.S. 671, 693–94, 95 S.Ct. 1255, 1268, 43 L.Ed.2d 541 (1975); *United States v. Tombrello,* 666 F.2d 485, 489 (11th Cir.), *cert. denied,* 456 U.S. 994, 102 S.Ct. 2279, 73 L.Ed.2d 1291 (1982). And they are based in part on the belief that the likelihood of accomplishment of a crime is greater when more than one person agrees to engage in criminal activity. *See Callanan v. United States,* 364 U.S. 587, 593, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961).

What Quarnstrom hoped to achieve by entering into this agreement is of little consequence. Seldom does anyone enter into an illegal activity without the hope of acquiring something perceived to be important. The usual goal in a drug conspiracy is financial gain. Yet a person would be just as guilty if the motive were revenge or even to obtain money for a worthy cause. It may be that one bears a grudge against the dominant drug seller in a particular area, and the only purpose in entering the conspiracy is to obtain inside knowledge of the operation for sabotage purposes. Or it

---

**3.** Vaughn went on to explain that his equipment problems included the crash of an airplane and transmission difficulties with a particular boat.

**4.** Quarnstrom maintains that his role in the conspiracy is no different from that of the DEA agents. Although ingenious, the analogy is not persuasive. The DEA agents were acting solely as government informants, and are effectively granted immunity for acting upon the instructions of the Attorney General. *Cf.* 21 U.S. C.A. § 878(5) (1981) (authorizing agents to act pursuant to the instruction of the Attorney General). Moreover, the agents clearly withdrew from the conspiracy while Quarnstrom did nothing to defeat its furtherance. Although after the October meetings Quarnstrom returned to California, mere cessation of activity in furtherance of the conspiracy does not constitute withdrawal. To withdraw, a co-conspirator must affirmatively defeat or disavow the purpose of the conspiracy. *United States v. Quesada-Rosadal,* 685 F.2d 1281, 1284 (11th Cir.1982); *United States v. Diaz,* 662 F.2d 713, 716 (11th Cir.1981).

may be that one wants to write a book, play or television script. Regardless of what the conspirator hopes to get out of it, conspiracy is a criminal act, and the issue properly phrased is whether Quarnstrom knowingly and intentionally entered into it. *See Lee,* 694 F.2d at 945; *Tamargo,* 672 F.2d at 889; *Spradlen,* 662 F.2d at 727.

Quarnstrom's reliance on *United States v. Harbin,* 601 F.2d 773 (5th Cir.), *cert. denied,* 444 U.S. 954, 100 S.Ct. 433, 62 L.Ed.2d 327 (1979), to demonstrate that he did not intend to enter the conspiracy is not persuasive. In *Harbin,* a defendant's conviction for a drug related conspiracy was reversed for insufficient evidence because the record supported his claim that he was unfamiliar with the conspiracy's drug transactions. 601 F.2d at 783. The court found that the defendant's telephone inquiries to other alleged members of the conspiracy indicated only that he was "curious" about illegal drug activities. *Id.* In marked contrast, the evidence in the present case indicates that Quarnstrom fully participated in meetings with the agents, expressed a thorough understanding of the details of the conspiracy, and agreed to supply services needed for its success.

Similarly unavailing is Quarnstrom's reliance on *United States v. Reyes,* 595 F.2d 275 (5th Cir.1979). In *Reyes,* after tracking an aircraft on an erratic course, customs agents searched the plane and found traces of marijuana in its cargo area. The cargo area also had been smeared with fresh pineapple to mask the smell of the marijuana. *Id.* at 280. Later, the Coast Guard recovered bales of marijuana floating in the sea under the recorded flight path of the plane. *Id.* at 278. The defendants on appeal were four illegal aliens who claimed to be passengers on the plane solely for the purpose of entering the United States illegally.[5] Their convictions were reversed because the only evidence adduced against them was their presence on the aircraft when the plane landed. *Id.* at 280. There was no testimony that the aliens ejected the bales or smeared the cargo area with pineapple. Moreover, "[n]o active role in the alleged conspiracy or in the charged importation was even intimated during the government's case." *Id.*

■ Conversely, the evidence indicates that Quarnstrom was not a passive bystander to the conspiracy. The testimony of the agents, as well as a taped telephone conversation between Quarnstrom and one of the agents demonstrate that Quarnstrom was integrally involved in the operation. Applying the *Bell* standard therefore a reasonable jury could find that Quarnstrom had "the deliberate, knowing and specific intent to join the conspiracy." *Davis,* 679 F.2d at 853 (quoting *United States v. Morado,* 454 F.2d 167, 175 (5th Cir.), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972).). As stated in *Bell,* "a jury is free to choose among reasonable constructions of the evidence." 678 F.2d at 549. Here, the jury simply concluded that Quarnstrom's actions and statements evidenced his intent to join the conspiracy, no matter what his ultimate goal may have been.[6]

### III.

Appellants Badolato and Vaughn next contend that the trial court erred in allow-

---

**5.** The pilot of the plane was a co-defendant at trial, but jumped bond while the appeal was pending. His appeal was dismissed. 595 F.2d at 277 n. 1.

**6.** Our holding simply is that sufficient evidence supports the jury's verdict that Quarnstrom intended to enter into the conspiracy. In discounting the effect of his motivation in this determination we do not intend to hold that motivation or purpose plays no role in these proceedings. Such considerations are most appropriate at the sentencing stage of a trial. Indeed, the record indicates that the district judge did consider Quarnstrom's purpose at the sentencing hearing and, as a result, dispensed a more lenient sentence to Quarnstrom than to Badolato and Vaughn.

At this stage of the litigation we would note further that Quarnstrom still may move to reduce his sentence. Rule 35(b) of the Federal Rules of Criminal Procedure authorizes a reduction of sentence within 120 days of this affirmance. If he feels that the sentencing judge did not give sufficient consideration to what he contends his purposes were, such contentions can be presented under a Rule 35(b) motion. We express no opinion on the merits of such a motion should one be filed.

ing the Government to show the jury the videotape of the February meeting. They argue that it should have been excluded under the extrinsic evidence rule. Federal Rule of Evidence 404(b) [7], however, provides for the admissibility of evidence under limited circumstances, and in *United States v. Beechum,* 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), the court set forth the rules for determining when evidence of an extrinsic offense is admissible. First, the evidence must be relevant to an issue other than the defendant's character. Second, its probative value must not be substantially outweighed by undue prejudice. 582 F.2d at 911; *accord, United States v. Mitchell,* 666 F.2d 1385 (11th Cir. 1981), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2943, 73 L.Ed.2d 1340 (1982).

The first prong of the *Beechum* test is satisfied "if the evidence goes to the defendant's intent, the extrinsic offense requires the same intent as the charged offense, and the jury could find that the defendant committed the extrinsic offense." *Mitchell,* 666 F.2d at 1389; *accord United States v. Lippner,* 676 F.2d at 461. The videotape of the February meeting satisfies these criteria. Both the extrinsic and the charged offense involve the same intent to violate the narcotic laws. Appellants' primary argument, is that government failed to prove that Badolato and Vaughn committed the extrinsic offense, because the February meeting ended with Badolato stating he would contact the agents if he decided to buy the marijuana. However, in *Beechum,* the court defined the term "offense" to include other crimes, wrongs or acts regardless of whether the extrinsic activity gives rise to criminal liability. 582 F.2d at 903 n. 1. Thus, appellant's asserted requirement of a completed illegal act is not warranted under *Beechum.*

The second prong of *Beechum* involves balancing the probative value of the film against its prejudicial impact. Moreover, like a Fed.R.Evid. 403 admissibility ruling, the trial judge's determination may only be reviewed for abuse of discretion. *Lippner,* 676 F.2d at 462. We find no such abuse in the court's decision to admit the videotape. The district court carefully considered the *Beechum* factors, and ruled it admissible for the purpose of showing intent—a contested issue at trial.

## IV.

Each appellant maintains that his trial should have been severed from the trials of his co-defendants. Federal Rule of Criminal Procedure 14 authorizes severance if the district court determines prejudice will result from joinder. But the decision to sever lies within the discretion of the district judge, and will not be overturned in the absence of abuse of that discretion. *United States v. Riola,* 694 F.2d 670, 672 (11th Cir.1983). Moreover, a district court decision will not be overturned by a showing of some antagonism or prejudice. *Id.* Instead, appellants must demonstrate that they received a fundamentally unfair trial and "suffered compelling prejudice against which the trial court was unable to afford protection." *Id.* (quoting *United States v. Berkowitz,* 662 F.2d 1127, 1132 (5th Cir. 1981).).

Badolato and Vaughn argue that their trials should have been severed because their defenses were antagonistic and mutually exclusive; Badolato contended that he lacked the requisite agreement, while Vaughn maintained that he was the target of a governmental frame-up. To warrant reversal, however, appellants. must demonstrate an irreconcilable conflict of defenses. *United States v. Capo,* 693 F.2d 1330, 1335 (11th Cir.1982). That is, "if the jury, in order to believe the core of testimony offered on behalf of [one] defendant,

---

**7.** Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

must necessarily disbelieve the testimony offered on behalf of his co-defendant," the trial should be severed. *United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir. 1981); *accord Riola,* 694 F.2d at 672.

Although each appellant claimed a separate defense, the jury would not have to disbelieve one to believe the other. Badolato's defense that he never agreed to anything was not inconsistent with Vaughn's defense that John Mitchell and Richard Nixon were somehow orchestrating the entire scenario. *See United States v. Swanson,* 572 F.2d 523, 529 (5th Cir.1978), *cert. denied,* 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1979). Nor was it inconsistent with Quarnstrom's claim that he lacked the requisite intent to conspire. Similarly, Vaughn's frame-up defense did not require the jury to disbelieve Badolato's defense that he never agreed to anything or Quarnstrom's defense that he was a passive observer.

Vaughn also claims that severance was necessary so that Vaughn's attorney could comment on the fact that Vaughn testified while co-defendants did not testify. *See DeLuna v. United States,* 308 F.2d 140 (5th Cir.1962). In *DeLuna,* the court found a duty to sever if necessary to protect a co-defendant's constitutional right to silence from prejudicial comment. 308 F.2d 141. However, *DeLuna* is applicable only when the defenses are based on mutually exclusive theories of guilt. *United States v. Nakaladski,* 481 F.2d 289, 302 (5th Cir.), *cert. denied,* 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469 (1973). Unlike in *DeLuna,* Vaughn's attorney did not wish to lay the blame on co-defendants Badolato and Quarnstrom in order to vindicate his client. *See* 308 F.2d at 142. Because the defenses offered in this trial were not mutually exclusive, the district court did not abuse its discretion in failing to sever.

Quarnstrom offers an additional plea for séverance on spill-over grounds. He maintains that he suffered a compelling prejudice from extrinsic evidence admitted against his co-defendants. Quarnstrom asserts that in the absence of this spill-over effect, the jury would never have convicted him. The test in this context is

> [w]hether under all circumstances of the particular case ... it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted.

*Lippner,* 676 F.2d at 464–65 (quoting *Tillman v. United States,* 406 F.2d 930, 935 (5th Cir.1969).).

Quarnstrom's spill-over argument is not persuasive. Admitting evidence of prior or subsequent misconduct by some defendants does not necessarily warrant severance to protect co-defendants from guilt by association. *See United States v. Davis,* 546 F.2d 617, 620 (5th Cir.1977). Here, the extrinsic evidence admitted against Badolato and Vaughn is not inconsistent with Quarnstrom's defense. Indeed, it arguably enhanced Quarnstrom's contention that he had to remain undercover to win the confidence of undesirable drug smugglers. In any event, Quarnstrom can offer no reason why the jurors could not separate which evidence was relevant to which defendant, particularly in light of the trial judge's painstaking effort to so instruct the jury as each piece of evidence was introduced.

Quarnstrom's final argument for severance is that the district court erred in denying him the opportunity to show an educational film on teenage drug abuse that he had produced earlier in his film making career. The film consists primarily of interviews with teenagers relating their experiences with drugs. By showing the film, Quarnstrom sought to demonstrate the investigative technique he allegedly was using with Badolato and Vaughn. The district court, however, refused to show the film because of its prejudicial effect on the co-defendants.

Upon viewing the film, we find that its omission did not prejudice Quarnstrom sufficiently to warrant severance. Quarnstrom's ability to interview teenagers on film is of dubious probative value to his undercover defense. Nowhere does he allege that he misrepresented himself to the teens in the film in the same manner in which he alleges he misrepresented himself to Badolato, Vaughn, and the DEA agents.

■ Nor was Quarnstrom's ability to present defense prejudiced by the film's omission. Initially, the Government never denied that Quarnstrom was a film-maker and investigative journalist. In addition, two of Quarnstrom's witnesses testified to Quarnstrom's activities and techniques. Linda Obst, a motion picture producer, characterized Quarnstrom as "someone who was capable of penetrating the inside of stories . . ." Record, vol. 9, at 47. She also described Quarnstrom's idea for a film:

> Well, Dean's [Quarnstrom] idea was to give an insider's look at the big business operation of dope smuggling, give a sense of the adventure that was involved, the high risk involved, and the sense of people getting caught over their heads.

*Id.* at 46. Mark Lediard, a communication training expert, testified that he had produced a videotape with Quarnstrom to educate teenagers about drug abuse. *Id.* at 71, 73. Lediard also testified about Quarnstrom's proposed smuggling story:

> He told me he had been travelling; he had been finding it very easy to strike up conversations and hear all kinds of stories; and he thought the next draft of the story would be a much more powerful draft because he had heard a great deal about how the business worked and what people did and so on.

*Id.* at 89.[8] Through this testimony Quarnstrom was able to establish his explanation for his association with Badolato, Vaughn, and the DEA agents. Showing

the film would not have assisted in his defense to the extent that it was offered to demonstrate technique, since he was not using the same technique. Quarnstrom therefore was not sufficiently prejudiced to justify overturning the trial judge's decision not to sever.

■ Having determined that the film did not justify severance, the district court properly determined that its prejudicial effect far outweighed its dubious probative value. In the film the teenagers discuss all sorts of bad drug experiences including experiences with drugs other than marijuana. The film itself is a subtle and poignant testimony to the evils of teenage drug abuse and would therefore reflect poorly on those engaged in the business of furthering such abuse for financial gain. What Quarnstrom ultimately sought to prove by its admission was that anyone who would make such a film could only have good motives for associating with drug smugglers. However, as discussed above, Quarnstrom's motivation was not the issue before the jury.

### V.

As part of his motion for a new trial, appellant Vaughn maintained that he was denied his sixth amendment right to effective assistance of appointed counsel. Vaughn was declared an indigent by the court, and John McKnight was appointed to represent him. The district court conducted a plenary hearing specifically on the issue of effectiveness of counsel and concluded that McKnight's performance was reasonably effective under all the circumstances.

■ Generally, ineffective assistance of counsel claims are not considered on direct appeal because a district court normally has not had the opportunity to conduct an evidentiary hearing or to render findings of fact. *E.g., United States v. Rodriguez,*

---

**8.** Although both Obst and Lediard testified that they knew Quarnstrom was in contact with drug smugglers, neither could offer any details of the extent of his involvement or lack thereof. Apparently, Quarnstrom was on his own, and

was to obtain the information by his own means. *See* Record vol. 1, at 52. In other words, Quarnstrom was free to enter into conspiracy if he felt that was the best way to obtain the desired information.

582 F.2d 1015 (5th Cir.1978). Here, however, the district court has conducted a full hearing and has developed a complete record. The court also analyzed the issue thoroughly in its order denying defendants' motions for judgment notwithstanding the verdict and new trial. Therefore, rather than dismissing Vaughn's claim without prejudice to raise it pursuant to 28 U.S.C. § 2255, we address the issue.

 In *Washington v. Strickland*, 693 F.2d 1243 (5th Cir. Unit B 1982) (en banc), the court concluded that to sustain a claim of ineffective assistance of counsel, an appellant must demonstrate both a denial of effective assistance of counsel and a showing of prejudice 693 F.2d at 1258. Upon review of the entire record, we conclude that Vaughn has failed to satisfy either requirement. Vaughn's initial complaint that McKnight lacked sufficient experience in federal criminal trials alone is unrelated to the question whether Vaughn received reasonably effective assistance of counsel. Similarly unavailing is Vaughn's second contention that McKnight failed to pursue an entrapment defense. As the district court found, "On the contrary, McKnight testified that he did consider [an entrapment defense] and determined not to press it overtly. The practical wisdom of this choice was supported by the testimony of government agents at trial indicating Vaughn made the first overtures concerning the importation scheme." Record, vol. 4 at 662. *See United States v. Killian,* 639 F.2d 206, 210 (5th Cir.1981).

 Vaughn's most plausible argument is that McKnight failed to interview and to compel the attendance of four witnesses who allegedly could have shed light on Vaughn's defense that Robert Abplanalp, a friend of former President Richard Nixon and former Attorney General John Mitchell, was somehow using his influence with the former Republican Administration to indict Vaughn in 1981. McKnight did subpoena these potential witnesses (three were served and one could not be located); however, not one appeared at trial. McKnight is now faulted for failing to compel the attendance of the witnesses and failing to seek a continuance. The district court's assessment of that charge is as follows:

> As previously mentioned, McKnight is also faulted about his ignorance in failing to know how to compel the attendance of witnesses Abplanalp and the like. But this is not even good 20–20 hindsight. It is sheer fantasy to argue that any of those subpoenaed would have supported Vaughn. On the contrary, the apparent refusal of these witnesses to attend the trial gave McKnight some semblance of a basis for arguing that the arrogant flaunting of the judicial process by Abplanalp and his lawyer was further evidence of the truth of Vaughn's claim of a "conspiracy to get him."

Record, vol. 4 at 665. We agree with this assessment as it pertains to McKnight's failure to compel attendance of the witnesses.

 More troubling is the allegation that McKnight failed to interview these potential witnesses. This is because the failure to conduct a reasonably substantial investigation into a defendant's one plausible line of defense is not a permissible trial strategy. *Washington,* 693 F.2d at 1252. Although McKnight testified that he believed Vaughn's "conspiracy" defense to be plausible "[t]he scope of duty to investigate into defendant's one line of defense may be affected . . . by factors such as the strength of the government's case." *Id.* at 1253 n. 16. Undoubtedly, the Government's best case was against Vaughn, the most active participant in the October plans. But, in addition, the Republican conspiracy was not Vaughn's only line of defense. He also generally denied agreeing to enter into the conspiracy, a defense actively pursued by McKnight throughout the proceedings. The district court's finding that McKnight provided reasonably effective assistance to Vaughn is therefore amply supported by the record. We note further that at the post trial hearing, Vaughn proffered no evidence that the potential witnesses would have testified to anything favorable to Vaughn's defense. He, therefore, also

failed to demonstrate any degree of prejudice.

For the above reasons, the judgments of the district court are

AFFIRMED.