**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Annie Ruth BOVAIN, Willie Alfred Brown, Dean Rickett, William Laselle Thornton, Charles Finch, William Clyde Perkins, Alvin R. Heath, Defendants-Appellants.**

**No. 81-7350.**

United States Court of Appeals,
Eleventh Circuit.

June 27, 1983.

Certiorari Denied Oct. 11, 1983.
See 104 S.Ct. 251.

Thomas W. Witcher, Decatur, Ga. (Court appointed), for Bovain.

Douglas N. Peters, Decatur, Ga. (Court appointed), for Brown.

Allan A. Ackerman, Chicago, Ill., for Rickett et al.

P. Bruce Kirwan, Atlanta, Ga. (Court appointed), for Thornton.

Brooks S. Franklin, Atlanta, Ga., for Finch.

Joseph M. Winter, Atlanta, Ga., for Perkins.

Cyril C. Hall, Pontiac, Mich. (Court appointed), for Heath.

William L. Harper, U.S. Atty., Julie E. Carnes, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before KRAVITCH, HENDERSON and ANDERSON, Circuit Judges.

ALBERT J. HENDERSON, Circuit Judge:

The appellants were charged in the United States District Court for the Northern District of Georgia with unlawful distribu-

tion of, and conspiracy to distribute, heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1976). Three were found guilty only of conspiracy and four were convicted on both conspiracy and substantive distribution counts. Three other defendants were acquitted by the jury. Finding no error, we affirm.

In 1977, John Nichols, who later pled guilty and testified for the government, introduced Charles Finch, a resident of Atlanta, Georgia to Dean Rickett, who lived in Chicago, Illinois. Thereafter, Finch began traveling to Chicago and Indianapolis every four or five days to purchase large quantities of heroin from Rickett. Annie Bovain assisted Finch in cutting and selling the drug in Atlanta. Willie Brown bought heroin from them for resale to his own customers, one of whom was an undercover agent. The police learned through a reliable informant that a major heroin supplier lived at 3255 Chestnut Drive, Apartment 16, the residence of Annie Bovain. The agents set up a surveillance of the apartment and observed Brown and Finch entering the premises. On May 10, 1977, they obtained a search warrant and entered the dwelling, seizing a quantity of heroin just as Bovain and Finch were attempting to flush it down the toilet. Bovain, Brown, and Finch were then arrested in the apartment.

Soon after that time, Brown and Finch were tried and convicted in Florida on state narcotic charges. For awhile, the drug operation "cooled down," but Finch soon escaped from custody and by the autumn of 1978, Finch, Nichols, Rickett, Alvin Heath, William Thornton and William Perkins were all trafficking in heroin together. Twice in January, 1979, Nichols, accompanied by Finch, sold to an undercover agent heroin that Thornton and Finch had obtained from Rickett. Nichols also made several sales to Perkins, whose customers wanted small quantities. Agents of the Drug Enforcement Administration (DEA) arrested Nichols on February 28, 1978 and he thereafter began cooperating with the government.

On August 7, 1979, a grand jury indicted the appellants and several other defendants. The grand jury returned a superseding indictment on October 5, 1979. Trial began on December 4, 1979, but the district court declared a mistrial six days later. The second trial—against fewer defendants—did not begin until February, 1981. Nichols pled guilty and was a key witness for the prosecution. Three of the indicted participants were acquitted. Of the appellants, Heath, Perkins, and Brown were convicted only of conspiring to distribute heroin, whereas Bovain, Finch, Rickett, and Thornton were found guilty of both conspiracy and substantive distribution charges.

■ Thornton, Rickett and Brown contend that the district court erred in denying their motions for severance. Fed.R.Crim.P. 14 provides for a severance when it appears that a defendant or the government is prejudiced by a joinder of defendants or offenses. The grant or denial of a severance is within the discretion of the trial judge, *United States v. Butera,* 677 F.2d 1376 (11th Cir.1982), and will be overturned only upon a showing of an abuse of discretion. *United States v. Badolato,* 701 F.2d 915 at 923 (11th Cir.1983); *United States v. Riola,* 694 F.2d 670, 672 (11th Cir.1983). The defendants must demonstrate that the denial of a severance resulted in "specific and compelling prejudice against which the trial court was unable to afford protection." *Id.* It is a generally accepted principle that in conspiracy cases, defendants jointly indicted should be tried together. *United States v. Lippner,* 676 F.2d 456, 464 (11th Cir.1982). Only if the jury could not "separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him" should severance be granted. The test is a stringent one. *Id.; United States v. Brock,* 669 F.2d 655, 660 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 208, 74 L.Ed.2d 167 (1982).

■ Willie Brown alleges that he suffered compelling prejudice because he was not permitted to present his complete defense. The district court refused to admit testimony that Brown was incarcerated ear-

ly in the conspiracy after his Florida conviction. The purpose of this evidence, according to Brown, was to demonstrate his lack of guilt in the later illegal acts committed by his alleged coconspirators. The government objected to such testimony on the ground that Brown would be suggesting to the jury that he was already being punished, and should not be penalized twice for the same crime. His codefendants claimed that the "spillover" effect of Brown's admission of guilt would unfairly prejudice them. The district court carefully weighed the competing interests and considered whether Brown would be denied equal protection if he were precluded from explaining his whereabouts from 1977 to 1979, while the other defendants could try to exculpate themselves. Ultimately, Brown's attorney was allowed to state to the jury that his client had been in jail during this time and that the evidence of events occurring after May 10, 1977 did not implicate Brown. Thus, he had the opportunity to show why he could not have participated in the illegal drug transactions transpiring after 1977. The fact that he was not permitted to dwell at length upon his earlier conviction cannot be said to have prejudiced his case, nor was it an abuse of the district court's discretion to limit the information on this matter.

William Thornton, on the other hand, insists that he was prejudiced by the "spillover" effect of Brown's acknowledged guilt despite the district court's efforts to limit its harmful impact on the other defendants. Consequently, he asserts that he was entitled to a severance. Both the Eleventh and former Fifth Circuits [1] have emphasized that some bias is inherent in every trial, and only when "such prejudice appears to be *compelling* does severance become warranted." *Lippner,* 676 F.2d at 464, *quoting Brock,* 669 F.2d at 660 and *United States v. Perez,* 489 F.2d 51, 65 (5th Cir.1973). The well established test for determining when the spillover effect of one codefendant's guilt results in compelling prejudice to another is

[w]hether under all circumstances of the particular case . . . it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted.

*Badolato,* at 924, and cases cited therein.

■ The resolution of prejudicial effect depends on the facts of each particular trial. This court has recently held, in two instances, that the government's introduction of extrinsic crimes evidence against some defendants did not prejudice the others. *Badolato,* at 924; *Lippner,* 676 F.2d at 465. The case at bar differs slightly in that the jury became aware of Brown's prior conviction through his own disclosure rather than through the efforts of the prosecution. However, as in *Badolato* and *Lippner,* the district court took great pains to instruct the jury that the evidence against each defendant must be weighed separately. Record, vol. 21 at 4–8. The acquittal of three defendants reinforces the conclusion that the jury was able to make distinct assessments of each case. Any possible spillover effect did not result in a tainted, "blanket" guilty verdict. Moreover, Thornton's drug transactions occurred after Brown's imprisonment, so there was little, if any, possibility of confusion or harmful overlap of the evidence. In these circumstances, we do not believe that Thornton suffered compelling prejudice as a result of the joint trial.

[6] Rickett's motion for a severance was based on three reasons. First, he claims there was a misjoinder because the evidence revealed two conspiracies, not one as alleged by the government. He urges that the activities prior to the May 10, 1977

---

1. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981), this circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered before October 1, 1981.

arrest were separate from the subsequent drug sales. We disagree. Even if there were two conspiracies, "[p]roof of multiple conspiracies does not automatically constitute a fatal variance from a [single] conspiracy charged." *United States v. L'Hoste,* 609 F.2d 796, 801 (5th Cir.), *cert. denied,* 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980), *quoting United States v. Wayman,* 510 F.2d 1020 (5th Cir.), *cert. denied,* 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67 (1975).

Rickett next maintains that his trial should have been severed because he and Finch asserted inconsistent and antagonistic defenses. This multi-defendant trial presented many pitfalls, and the trial court was mindful of the potential prejudice to other defendants because of the impeachment of one witness. Although there was antagonism among the defendants, their efforts to discredit one another's testimony did not amount to irreconcilable defenses in the legal sense. "To cause the type of compelling prejudice that prevents codefendants from obtaining a fair trial, the defenses must conflict to the point of being . . . mutually exclusive." *United States v. Crawford,* 581 F.2d 489, 491 (5th Cir.1978). Reversal is not required unless "the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant." *Badolato,* at 923–24, *quoting United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir.1981). A severance is not necessary every time codefendants with inconsistent defenses are tried together. 581 F.2d at 491. The decisions of this circuit and the former Fifth Circuit mandate balancing the possible prejudice to the defendants against the public's interest in economy of judicial administration. *United States v. Salomon,* 609 F.2d 1172, 1176 (5th Cir.1980); *Crawford,* 581 F.2d at 491. In this case, Rickett and Finch attempted to malign each other without taking the witness stand themselves; rather, each elicited harmful information about the other by questioning the key witness,

Thornton. Rickett urges that this tactic resulted in the defendants' tendency to "dirty up" each other in this joint trial.[2] We acknowledge that when codefendants attack their companions by introducing incriminatory evidence, they carry out the function of the prosecution viz-a-viz one another. However, they did not assert irreconcilable defenses. Both denied their participation in the conspiracy and both primarily attacked Nichols' credibility. The determination of whether their antagonism resulted in compelling prejudice is committed to the discretion of the trial judge, and Rickett failed to show a conflict so prejudicial as to warrant separate trial. *United States v. Riola,* 694 F.2d 670, 672 (11th Cir.1983); *United States v. Capo,* 693 F.2d 1330, 1335 (11th Cir.1982); *United States v. Berkowitz,* 662 F.2d 1127, 1133 (5th Cir. 1981).

Rickett finally argues that if he and Finch had been tried separately, or if Finch had been granted immunity, Finch's testimony would have absolved him of any guilt. In order to prevail on this assignment of error, the rule announced in *United States v. Rice,* 550 F.2d 1364, 1369 (5th Cir.), *cert. denied,* 434 U.S. 954, 98 S.Ct. 478, 54 L.Ed.2d 312 (1977), requires the defendant to demonstrate:

(1) bona fide need for the testimony;

(2) the substance of the desired testimony;

(3) its exculpatory nature and effect; and

(4) that the designated co-defendant will *in fact* testify at a separate trial.

. . . .

The trial court should

(1) examine the significance of the alleged exculpatory testimony in relation to the defendants' theory of defense;

(2) assess the extent to which the defendant might be prejudiced by the absence of the testimony;

(3) pay close attention to judicial administration and economy; and

(4) give weight to the timeliness of the motion.

---

2. Brief of Appellant-Rickett at 30.

*United States v. Morrow,* 537 F.2d 120, 135 (5th Cir.), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977); *United States v. Diez,* 515 F.2d 892, 903 (5th Cir.1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 780, 46 L.Ed.2d 641 (1976); *United States v. Burke,* 495 F.2d 1226, 1234 (5th Cir.), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974); *United States v. Martinez,* 486 F.2d 15, 22 (5th Cir.1973); *Byrd v. Wainwright,* 428 F.2d 1017, 1019–22 (5th Cir.1970). *Accord, United States v. Butler,* 611 F.2d 1066, 1071 (5th Cir.), *cert. denied,* 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980).

**3.** Rickett's counsel submitted his own affidavit, dated February 7, 1981, stating that Finch would offer exculpatory testimony in a separate trial. Specifically, he stated that Finch "would tell the Court that the entire Nichols 'story' as regarding Rickett giving Finch some 50 ounces of heroin in Indiana is totally false. Further, Finch would tell this Court that many of the conversations wherein Nichols said that Finch told him different things as regarding Rickett are false." Affidavit of Allan A. Ackerman, Brief of Appellant-Rickett, Group Appendix A.

**4.** The relevant portions of Finch's testimony are:

THE COURT: Let me ask you a question first, Mr. Finch, you have heard counsel for Mr. Jones, as well as counsel for Rickett, tell me that they had your assurance that you would testify and give evidence that would be favorable to Len Jones and favorable to Dean Rickett if you were allowed to do so in an independent trial, that is as opposed to this trial where you are still a Defendant, do you understand?

THE WITNESS: Yes, sir.

THE COURT: What do you say about that?

THE WITNESS: I had talked to both of them about it and I told them that I would testify as long as I wouldn't be testifying against myself.

THE COURT: What would you testify, simply that what John Nichols has testified here in this trial is not true?

THE WITNESS: Yes, sir.

THE COURT: That's all?

THE WITNESS: No, if he asked me about the matter about Jones, and about the part that we went to Bolden's, which would be true, we went to Bolden's house. But the thing about it, what he said about Jones was there, I never seen Jones before we come to this Court.

THE COURT: So your testimony would be that you didn't see anybody named Jones there or a man you know to be Jones?

Rickett did not apprise the court of Finch's possible exculpatory testimony until the ninth day of the second trial. Record, vol. 19 at 107–08.[3] Although the trial judge expressed reservations as to the timeliness of Rickett's motion, he conducted a hearing outside the presence of the jury to determine the nature of the proposed exculpatory evidence. Record, vol. 19 at 110. Finch was then called to the stand for the limited purpose of establishing what his testimony would be in a separate trial.[4] Finch simply branded as false Nichols' testimony with respect to one of the trips made by Finch

THE WITNESS: Right.

THE COURT: What about as far as Mr. Rickett is concerned, would you stand up and say he didn't do it, I did it.

THE WITNESS: Do what?

THE COURT: That's what I'm asking you.

THE WITNESS: That I knew Mr. Rickett, yeah, I knew Mr. Rickett.

THE COURT: What are you going to say?

THE WITNESS: All these occasions he is saying that I went to Chicago and met with Mr. Rickett on some drug transactions, that is not true.

THE COURT: You mean what Nichols has testified is not true?

THE WITNESS: Right, but I have been to Chicago and I do know Mr. Rickett.

MR. ACKERMAN: Your Honor, would you ask him specifically about Indiana? Remember there is an allegation from Nichols that there was—

THE COURT: So you would say that when Mr. Nichols said that you had gone to Indiana to be with Mr. Rickett that is not true?

THE WITNESS: I have never been to Indiana in my life.

THE COURT: Never been to Indiana. What else, do you have anything further?

CROSS–EXAMINATION

BY MR. ACKERMAN:

Q. To satisfy something from Your Honor, was the first time I spoke to you about this Wednesday of last week in this Courtroom?

A. Yes, it was. I think it was Wednesday.

Q. And was I sitting right over there when your lawyer was present?

A. I think so.

Q. Do you remember sending me a letter about February or March of 1980?

A. Right.

Q. Did I send a letter back to you, tell the Court what I said to you in that letter.

A. I can't remember exactly, but I think it was something about get in touch with my attorney and my attorney talk to you, be-

and Rickett to Indiana. The gist of his proffered testimony was that Nichols had lied about a few of the specific meetings between Finch and Rickett. Finch's testimony did not exonerate Rickett. In fact, it amounted primarily to a cumulative impeachment of Nichols. His statements had virtually no bearing on Rickett's guilt or innocence.

■ Therefore, applying the *Rice* factors, Rickett failed to demonstrate a bona fide need for the testimony because he did not show that isolated remarks about a few transactions would affect his overall portrayal as a key conspirator. Finch's statements were not significant to Rickett's defense, except as cumulative attacks on Nichols' veracity. Finch did not attest to Rickett's innocence, but merely indicated that he and Rickett were not together in Indiana. It is difficult to see how the absence of such testimony would prejudice Rickett. In addition, Finch qualified his

cause it was some kind of violation or something.

Q. That I couldn't talk to you even if I wanted to?

A. Right.

Q. And the first time from then until Wednesday is when I started talking to you then?

A. Right.

Q. Was it Wednesday or Thursday when you told me that if you were separated, if your guilt or innocence was finished, that you would tell the Court that there was no Indiana transaction?

A. That's right.

Q. And you also told me that at least half the things that Nichols said about things that you said to Nichols about Rickett were false.

A. That's right.

MR. ACKERMAN: That's what I learned.

THE COURT: Suppose you were found guilty—

MR. ACKERMAN: Your Honor, just to complete it, because Your Honor asked me about timeliness.

Q. (By Mr. Ackerman) In December, 1979, when we were in that other Court building and during that hearing, six or seven days of hearings, there was still a possibility that you were going to end up making some deal with the Government, wasn't that?

A. Some kind of talk, but I never understood it.

Q. Well, the fact of the matter is, in fact, that you were visiting with either Mr. Sutton or Mr. Smith, I don't know which, and there was talk of you being a Government witness.

A. Mr. Smith talked to my attorney and came out a couple of times with him to the jail and talked to me.

Q. That was when you were in Fulton County Jail, during the last trial, which was December, '79.

A. Right.

MR. ACKERMAN: That is the reason I can't tell you much earlier, Judge.

THE COURT: It's my understanding then, that even if you should be found guilty in this trial, that you would be willing to testify subsequently, that is, after this trial is over with, in an independent action involving either Mr. Jones or Mr. Rickett, and would give the kind of testimony that you have just described?

MR. FINCH: Yes, sir.

THE COURT: All right, anything else?

MR. SUTTON: May I ask him a couple of questions?

THE COURT: Yes, sir.

CROSS–EXAMINATION

BY MR. SUTTON:

Q. Mr. Finch, if I understand you correctly, your testimony with regard to Mr. Rickett would be that you were not involved with him in heroin dealings at all?

MR. ACKERMAN: That is objected to, that was not the question. I asked that man a specific instance in Indiana.

THE COURT: I was trying to read Martinez when you asked some of the questions and I may have missed it.

MR. SUTTON: No, Your Honor, I'm asking a question asked by Your Honor initially of this individual, and it is very relevant to determine if his testimony would be exculpatory.

THE COURT: I don't think I asked him whether or not he was ever involved in any drug dealings in Indiana, I asked him whether he had been to Indiana with Mr. Rickett. His testimony was he had never been to Indiana.

MR. SUTTON: That's not exculpatory enough

THE COURT: I know it.

MR. SUTTON: —to warrant a severance at all.

THE COURT: It's just somebody taking the stand and saying, you know, I didn't do it, everything somebody else has said. If he feels that strong about it, he can take the stand during this trial.

. . . .

MR. TETRICK: No, Your Honor, that's really all it is.

THE COURT: Let me read Martinez, and I think as far as Mr. Rickett is concerned, the motion to sever is denied, Mr. Ackerman.

willingness to testify, stating that he agreed to do so only if he would not have to incriminate himself. Had the judge granted a severance, there is no assurance that Finch would have appeared at a later trial.[5] Finally, the factors of judicial economy and timeliness of the motion weigh heavily against severance. Motions to sever on alternative grounds had already been denied, the lengthy proceedings were almost completed, and the sudden discovery of a new reason for severance was simply not compelling enough to warrant disruption of the ongoing trial. The evidence against Rickett was overwhelming and he has not demonstrated any prejudice because of the unavailability of Finch's testimony. The trial judge was sensitive to the problems inherent in a multi-defendant trial. Having weighed all the conflicting considerations, we conclude that the district court did not abuse its discretion in denying the appellants' motions for severance.

Finch urges that the trial court erred in allowing Rickett to present evidence of Finch's prior criminal convictions. Neither Finch nor Rickett testified at the trial. However, Nichols testified as to out-of-court statements made by Finch about Rickett's drug activity. Rickett then attempted to impeach Finch's credibility as a hearsay declarant by introducing certified records of Finch's 1974 conviction for stolen money orders and his 1977 narcotics conviction. The court admitted that evidence, but refused to allow records of Finch's convictions for forgery and escape. Finch argues that the admission of his prior convictions was improper because they constituted character evidence. Since Finch never injected his character into the case, he maintains that such evidence was both impermissible and prejudicial. Contrary to Finch's assertion, the evidence was not admitted as character evidence, but for impeachment purposes.

Fed.R.Evid. 806 provides that when a hearsay statement "has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, *by any evidence which would be admissible for those purposes if declarant had testified as a witness.*" (Emphasis added.) This rule is clarified in the notes of the Advisory Committee on Proposed Rules: "[t]he declarant of a hearsay statement which is admitted in evidence is in effect a witness. His credibility should in fairness be subject to impeachment and support as though he had in fact testified. See Rules 608 and 609 ..." In this instance, the relevant cross-reference is Fed.R.Evid. 609(a):

> For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or *established by public record during cross-examination* but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

(Emphasis added.) Applying these guidelines, the result reached by the district court is straightforward and logical. Because Finch is a hearsay declarant, his testimony may be treated like that of a witness (Rule 806), and as a witness, he can be impeached (Rules 608, 609). Therefore, the certified records of Finch's prior convictions were admissible for impeachment purposes (Rule 609).

The district court was careful to instruct the jury that evidence of Finch's convictions could be used to discredit the accuracy of his out-of-court statements, but that the prior crimes could not be considered as evidence of Finch's guilt on the charges contained in the indictment.[6] In a conspiracy

---

5. Finch's own conviction and pending appeal might well have diminished his earlier willingness to testify favorably for his codefendants at a subsequent trial.

6. The government contends on appeal that the evidence of Finch's prior drug conviction could have been offered as part of the prosecution's case-in-chief, to show intent, and thus, it was

case, the trial judge has the difficult task of balancing the countervailing interests of all the codefendants. Decisions on the admissibility of evidence are committed to the sound discretion of the district court, and will not be overturned on appeal absent a clear abuse of that discretion. *United States v. Cuni,* 689 F.2d 1353 (11th Cir. 1982). This situation was unusual in that both Rickett and Finch were defendants, but neither testified, and one sought to impeach the other during cross-examination of a third party. The trial judge evaluated the rights and interests at stake from many perspectives and ruled that the probative value of the evidence outweighed the risk of prejudice to Finch. Based on the applicable policy considerations and rules, the admission of the prior crimes evidence did not constitute an abuse of the court's discretion.

We have carefully reviewed the record and have duly considered each of the remaining assignments of error, including the sufficiency of the evidence, the denial of a motion to suppress seized heroin, the admission into evidence of a taped conversation and the testimony of coconspirators, the limitations on cross-examination, and the government's use of its peremptory challenges to dismiss black jury veniremen. Having evaluated each contention, we find them to be without merit.

Accordingly, the judgment of the district court is AFFIRMED.

admissible for that reason alone. Because Finch is a defendant, as well as a hearsay declarant, evidence of his prior drug conviction would be admissible to show motive, intent, common plan or scheme. Fed.R.Evid. 404.

That argument, however, is peripheral and needs not be addressed here because the government did not offer the evidence for that purpose.